Edward McALEER, Administrator of the Estate of James F. McAleer; Hardy LeBel and Joan LeBel, Administrators of the Estate of Thomas LeBel, Plaintiffs,

v.

Travers C. SMITH, Administrator of the Estate of Stuart A. Finley; Mark Shirley Portal Litchfield and Robin Patrick Cecil–Wright d/b/a the China Clipper Society; Goods Export Ltd. d/b/a the China Clipper Society; Berry Brothers and Rudd Ltd. d/b/a Cutty Sark; American Sail Training Association; and Society of Lloyd's, Defendants.

Civ. A. No. 88–0544L.

United States District Court, D. Rhode Island.

April 30, 1992.

---

Edmund R. Pitts, Pitts & Pitts, Boston, Mass., for plaintiffs.

Mark A. Pogue, Stephen A. Fanning, Jr., Edwards & Angell, Providence, R.I., for defendant, Society of Lloyd's.

Richard H. Pettingell, Morrison, Mahoney & Miller, Boston, Mass., A. Lauriston Parks, III, Hanson, Curran, Parks & Whitman, Providence, R.I., for defendant, American Sail Training Ass'n.

Thomas J. Muzyka, Clinton & Muzyka, P.C., Boston, Mass., for defendant, Robin Patrick Cecil–Wright.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is before the Court on motions for summary judgment by two of the defendants, the American Sail Training Association ("ASTA") and the Society of Lloyd's ("Lloyd's"). This Court has previously ruled on motions to dismiss for lack of personal jurisdiction by four other defendants, denying all but the motion of defendant Goods Export Ltd. *See McAleer v. Smith,* 715 F.Supp. 1153, 1160 (D.R.I. 1989); *see also McAleer v. Smith,* 728 F.Supp. 857, 862 (D.R.I.1990) (Cecil–Wright's motion to reconsider denied).

This action arises out of the sinking of the sailing vessel S/V MARQUES on June 3, 1984, during the Cutty Sark International Tall Ships Race from Bermuda to Halifax, Nova Scotia. Plaintiffs' decedents were among the sail trainees who perished when the ship sank off the coast of Bermuda in a squall during its first night at sea. James McAleer was a forty-six-year-old bachelor from Massachusetts who had been sailing since he was fourteen. A meticulous, analytical person, McAleer had taken time off from his employment to fulfill a lifelong dream of sailing on an historic tall ship. Thomas LeBel was a fifteen-year-old student from Rhode Island who had extensive sailing experience. This was his first cruise and his first big adventure out in life.

Plaintiffs brought this action pursuant to the Jones Act, 46 U.S.C. § 688 (1988), the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 761–768 (1988), and general maritime survival law. Plaintiffs also allege several counts of deceit and breach of warranty. This Court's primary concern is the interrelation of the DOHSA claims with the general maritime survival claims for conscious pain and suffering. Secondarily, the Court shall address whether defendant Lloyd's can be held liable for any aspect of this tragedy.

## I. ASTA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant ASTA has moved for summary judgment with respect to plaintiffs' claims for conscious pain and suffering brought pursuant to general maritime survival law. ASTA alleges that these claims are both legally inadequate and factually unsubstantiated. In addition, ASTA has moved to strike plaintiffs' demand for a

jury trial. The Court shall address each of these issues in turn.[1]

### A. Legal Adequacy of Plaintiffs' Survival Claims

 Plaintiffs seek to recover damages for the drowning deaths of their decedents pursuant to DOHSA, which affords a cause of action "[w]henever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore ... of the United States." 46 U.S.C. § 761. The measure of damages in a DOHSA claim "shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. § 762. By specifying pecuniary loss, DOHSA precludes plaintiffs from recovering for the decedents' conscious pain and suffering as part of the wrongful death claim brought under DOHSA. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 623–25, 98 S.Ct. 2010, 2013–15, 56 L.Ed.2d 581 (1978).

Although plaintiffs may not recover pain and suffering damages pursuant to DOHSA, they have brought claims for conscious pain and suffering under the general maritime survival law in conjunction with their DOHSA wrongful death claims. Survival claims and wrongful death claims are distinct grounds for recovery. Wrongful death claims redress the pecuniary losses suffered by the decedent's beneficiaries on account of the decedent's death. Survival claims, on the other hand, permit the decedent's estate to recover damages for personal injuries to the decedent for which the decedent could have brought suit had death not intervened. *See Sea–Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 575 n. 2, 94 S.Ct. 806, 810 n. 2, 39 L.Ed.2d 9 (1974). The issue here is whether the DOHSA claims preempt the supplementary general maritime survival claims.

Maritime law, also known as admiralty law, has evolved along a path distinct from the rest of the common law. *See generally Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 386–87, 90 S.Ct. 1772, 1780–81, 26 L.Ed.2d 339 (1970). From the late nineteenth century the general rule of maritime law provided that wrongful death actions were not actionable unless expressly allowed by state or federal statute. *The Harrisburg*, 119 U.S. 199, 213–14, 7 S.Ct. 140, 146–47, 30 L.Ed. 358 (1886). By enacting DOHSA in 1920, Congress provided a federal ground of recovery for wrongful death occurring on the high seas. 46 U.S.C. § 761. For deaths that occurred in territorial waters, however, recovery was permissible pursuant to available state statutes only. *Moragne*, 398 U.S. at 393, 90 S.Ct. at 1783.

In 1970 the Supreme Court overruled the longstanding rule of *The Harrisburg* and held that general maritime law provided a cause of action for wrongful death in territorial waters. *Moragne*, 398 U.S. at 409, 90 S.Ct. at 1792. The *Moragne* holding was significant in that it liberated wrongful death actions from reliance upon the inconsistent state wrongful death laws and filled a legislative void that had arisen between the state laws and DOHSA. *Id.* at 399–400, 90 S.Ct. at 1786–87. Most importantly, *Moragne* promoted uniformity in maritime wrongful death law without regard to where the death occurred. *Id.* at 401–02, 90 S.Ct. at 1788–89.

Subsequently, several federal circuits relied upon *Moragne* to hold that the newly recognized general maritime wrongful death action also encompassed a general maritime survival action, one that permitted recovery for conscious pain and suffering. *Barbe v. Drummond*, 507 F.2d 794, 799–800 (1st Cir.1974); *Spiller v. Thomas M. Lowe, Jr. & Assocs.*, 466 F.2d 903, 909–10 (8th Cir.1972); *Greene v. Vantage S.S. Corp.*, 466 F.2d 159, 166–67 (4th Cir.1972); *Dennis v. Central Gulf S.S. Corp.*, 453 F.2d 137, 140–41 (5th Cir.), *cert. denied*, 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218 (1972). In *Barbe* the First Circuit stated:

---

1. It is unnecessary to detail the relationship that existed between ASTA and the decedents because it has no bearing on these issues. Furthermore, that ground was thoroughly examined in *Heath v. American Sail Training Ass'n*, 644 F.Supp. 1459, 1469–70 (D.R.I.1986), a case brought by the beneficiaries of two other sail trainees who perished with McAleer and LeBel.

[W]e believe that the policy enunciated by the Supreme Court in *Moragne* provides ample support for us to hold that there is a federal maritime survival action, created by decisional law, for pain and suffering prior to death. This conclusion comports well with the philosophy of *Moragne*, in that it remedies the nonexistence of a federal cause of action and thereby avoids the problem of making plaintiff's recovery turn on the existence of a state survival statute.... It also avoids a conflict with DOHSA, since survival and wrongful death actions have long been recognized as distinct causes of action.

507 F.2d at 799–800. Thus, the *Barbe* court found that a general maritime survival action could be derived from the penumbra of *Moragne*'s holding and used to supplement a DOHSA claim, even in a non-*Moragne* situation. *Id.* *Barbe*, however, did not address the preemption issue.

A few years after *Barbe* the Supreme Court decided the case of *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). *Higginbotham* held that the measure of damages for a wrongful death action on the high seas was governed exclusively by DOHSA; therefore, only pecuniary loss was recoverable in a wrongful death action. *Id.* at 623–25, 98 S.Ct. at 2013–15. ASTA contends that this case and two later Supreme Court cases stand for the proposition that DOHSA has a preemptive effect and, thus, limits plaintiffs' damages to their pecuniary losses. The Court agrees that these decisions delineate the restrictions that DOHSA imposes upon wrongful death claims; they do not address, however, the preemption issue regarding survival claims.

For example, *Higginbotham* did not concern whether a DOHSA claim could be *supplemented* by a survival action for conscious pain and suffering. The Court granted certiorari only on whether nonpecuniary damages could be recovered in a general maritime wrongful death action. *Id.* at 619–20, 98 S.Ct. at 2011–12. In view of the clear distinction between survival actions and wrongful death actions, as discussed above, this Court finds that *Higginbotham* does not preclude the supplementation of DOHSA claims with general maritime survival claims. *Accord Azzopardi v. Ocean Drilling & Exploration Co.*, 742 F.2d 890, 893–94 (5th Cir.1984); *Deniston v. Boeing Co.*, No. 87–CV–1205, 1991 WL 39194, at *8 (N.D.N.Y. Mar. 22, 1991); *Brown v. United States*, 615 F.Supp. 391, 401 (D.Mass.1985), *dismissed without opinion*, 795 F.2d 76 (1st Cir. 1986), *cert. denied*, 479 U.S. 1058, 107 S.Ct. 938, 93 L.Ed.2d 989 (1987); *Kuntz v. Windjammer "Barefoot" Cruises, Ltd.*, 573 F.Supp. 1277, 1286 (W.D.Pa.1983), *aff'd without opinion*, 738 F.2d 423 (3d Cir.), *cert. denied*, 469 U.S. 858, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984); *Chute v. United States*, 466 F.Supp. 61, 69–70 (D.Mass. 1978). As the Supreme Court stated in *Higginbotham*:

> [DOHSA] does not address every issue of wrongful-death law ... but when it does speak directly to a question, the courts are not free to "supplement" Congress' answer so thoroughly that the Act becomes meaningless.... *There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.*

436 U.S. at 625, 98 S.Ct. at 2015 (emphasis added). Accordingly, *Higginbotham* does not undermine the holding of *Barbe*.

In *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), the Supreme Court reiterated that DOHSA was the exclusive wrongful death remedy for a person's demise on the high seas, stating, "the conclusion that the state statutes are pre-empted by DOHSA *where it applies* is inevitable." *Id.* at 232, 106 S.Ct. at 2499 (emphasis added). The phrase "where it applies" means that recovery for wrongful death on the high seas shall be governed exclusively by DOHSA, precluding all other wrongful death claims. Nevertheless, such recovery may be supplemented by a survival claim because DOHSA does not apply to survival claims. The *Tallentire* Court expressly declined to address whether a DOHSA claim could be

supplemented by a state survival statute applicable to the high seas. *Id.* at 215 n. 1, 106 S.Ct. at 2490 n. 1 (citing *Barbe*). The Court did not mention general maritime survival claims or their preemption by DOHSA. Therefore, *Tallentire* does not sabotage the holding of *Barbe*.

The most recent Supreme Court case that ASTA proffers in support of its preemption argument is *Miles v. Apex Marine Corp.*, —— U.S. ——, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). *Miles* involved a claim for the wrongful death of a seaman brought pursuant to the Jones Act. The Court held that a Jones Act claim did not preclude a general maritime wrongful death claim, stating:

> We may supplement these statutory remedies where doing so would achieve the uniform vindication of such policies consistent with our constitutional mandate, but we must also keep strictly within the limits imposed by Congress.

*Id.* 111 S.Ct. at 323. The Court determined, however, that loss of society was not recoverable as part of the general maritime wrongful death claim because the Jones Act limited wrongful death recovery to pecuniary loss. *Id.* at 325–26. In addition, the Court stated that lost future income was not recoverable as part of a general maritime survival claim because the Jones Act survival provision limited recovery to losses suffered during decedent's lifetime. *Id.* at 327–28. While noting that various federal circuit courts had developed a general maritime right of survival from *Moragne*, the Supreme Court declined to address the existence of such a cause of action because resolution of this issue was unnecessary to the Court's holding. *Id.* at 326–27. Accordingly, *Miles* does not subvert the holding of *Barbe*.

ASTA further contends that the Supreme Court has yet to approve the basis for the holding in *Barbe* (specifically, the philosophy of uniformity expressed in *Moragne*), and therefore, *Barbe*'s holding is speculative at best. It would, however, be more accurate to state that the Court has expressly *declined* to address *Barbe*'s holding. *Miles*, 111 S.Ct. at 326–27; *Tallen-*

*tire*, 477 U.S. at 215 n. 1, 106 S.Ct. at 2490 n. 1. This indicates neither approval nor disapproval by the Court.

Furthermore, it is likely that the Supreme Court would endorse *Barbe* if it chose to address the issue. In *Miles* the Court refused to limit the holding of *Moragne* to the facts of that case, stating, "We have described *Moragne* at length because it exemplifies the fundamental principles that guide our decision in this case." 111 S.Ct. at 323. This suggests that the *Moragne* policy is strong enough to sustain a holding such as that found in *Barbe*. *Id.* at 326–27. After all, "it is only a small leap from the decision in *Moragne* to an acceptance of the survival of personal injury actions as an integral part of the general maritime law." *Marsh v. Buckeye S.S. Co.*, 330 F.Supp. 972, 975 (N.D. Ohio 1971).

Finally, ASTA contends that Congress *intentionally* omitted a survival provision in DOHSA while including one in the Jones Act. The absence of a survival provision in DOHSA, however, should be accorded little significance. Neither DOHSA nor the Jones Act was drafted with the utmost care, and any inconsistencies between the two statutes were probably unintentional. *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 283–84, 100 S.Ct. 1673, 1678–79, 64 L.Ed.2d 284 (1980); *Deniston*, No. 87–CV–1205, 1991 WL 39194, at *7–8. Furthermore, the absence of a survival provision in DOHSA creates a legislative void that may be filled by the courts without undermining the limitations set by DOHSA. *Higginbotham*, 436 U.S. at 625, 98 S.Ct. at 2015; *Kuntz*, 573 F.Supp. at 1285; *Hamilton v. Estate of Weiss*, No. 82–766, 1983 WL 707, at *2 (D.Mass. Feb. 1, 1983). Permitting a general maritime survival action to supplement DOHSA does not produce a conflict because Congress chose to address only wrongful death actions in DOHSA. *See Kuntz*, 573 F.Supp. at 1285 (discussing legislative history of DOHSA).

Since DOHSA is a wrongful death statute which, whether through inadvertence or design, does not address survival of actions, it is entirely appropriate that the courts should fill what would otherwise

be a legislative void by allowing the general maritime law survival action based on *Moragne* to supplement DOHSA. *Azzopardi*, 742 F.2d at 894. Furthermore, allowing survival claims to supplement DOHSA promotes uniformity in admiralty actions, *Moragne*, 398 U.S. at 401–02, 90 S.Ct. at 1788–89, and upholds the special solicitude that the maritime law affords to seamen and their families, *id.* at 387, 90 S.Ct. at 1780.

Accordingly, this Court holds that plaintiffs may supplement their DOHSA claims with general maritime survival claims for the decedents' conscious pain and suffering before death.

#### B. *Factual Sufficiency of Plaintiffs' Survival Claims*

In addition to their argument of legal inadequacy, ASTA contends that there is no factual basis for the claims that James McAleer and Thomas LeBel experienced conscious pain and suffering prior to their deaths. In order to grant summary judgment on this claim, however, the Court must find that there is no genuine issue as to any material fact and that ASTA is entitled to judgment as a matter of law. *Heath v. American Sail Training Ass'n*, 644 F.Supp. 1459, 1464 (D.R.I.1986). The Court must view the record in the light most favorable to the plaintiffs, indulging all reasonable inferences in their favor, without weighing the evidence or determining credibility. *Id.*

To recover for their decedents' conscious pain and suffering, plaintiffs must establish that the decedents did not die instantaneously but were momentarily conscious before drowning. The duration of consciousness need not meet any prescriptive requirements and, in actuality, may necessarily have been brief. *Cook v. Ross Island Sand & Gravel Co.*, 626 F.2d 746, 750–51 (9th Cir.1980); *In re Connecticut Nat'l Bank*, 733 F.Supp. 14, 17 (S.D.N.Y. 1990), *vacated*, 928 F.2d 39 (2d Cir.1991). An autopsy performed on McAleer's body revealed only superficial bruises to the head; the cause of death was attributed to drowning. He was last seen on deck just before the ship capsized, harnessed to the railing until a fellow voyager untied him. LeBel was last seen below deck shortly before the squall arose, but his body was never recovered. While there is no direct evidence of the circumstances leading to the decedents' deaths, eyewitness accounts are not essential. *In re United States Steel Corp.*, 436 F.2d 1256, 1275 (6th Cir. 1970), *cert. denied*, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971).

In support of their claims, plaintiffs have presented the testimony of a medical expert, Lawrence Baker, M.D., who stated in his deposition that drowning does not occur instantaneously but, rather, entails several minutes of panic and anxiety as the person realizes that death is imminent. (Baker Dep., Pls.' Mem. in Opp'n to ASTA's Mot. Ex. 9 at 29.) *Compare Cook*, 626 F.2d at 752 (court upheld award of damages where similar testimony was presented) *with Connecticut Nat'l Bank*, 733 F.Supp. at 17 (damages not awarded where no such evidence presented). Furthermore, the absence of any skull fracture or severe trauma to McAleer's body supports a reasonable inference that he was conscious at the time of his death and possibly experienced a great deal of anxiety and terror. *See In re P & E Boat Rentals, Inc.*, 872 F.2d 642, 650 (5th Cir.1989) (no evidence of predeath blows to suggest unconsciousness); *Cook*, 626 F.2d at 750 (jury could infer consciousness from lack of skull fracture).

As for LeBel, the Court finds no direct evidence that he was conscious at the time of his death, but neither is there evidence that he was unconscious at that time. *Accord Dickerson v. Continental Oil Co.*, 449 F.2d 1209, 1216 (5th Cir.1971), *cert. denied*, 405 U.S. 934, 92 S.Ct. 942, 30 L.Ed.2d 809 (1972). In some cases courts have denied recovery because they found it equally reasonable to infer that the decedents died instantaneously or by some means other than drowning. *See Connecticut Nat'l Bank*, 733 F.Supp. at 17; *cf. In re Sincere Navigation Corp.*, 329 F.Supp. 652, 659 (E.D.La.1971) (claim for pain and suffering too conjectural), *aff'd in part and remanded in part sub nom. In re*

*S/S Helena,* 529 F.2d 744 (5th Cir.1976); *Gardner v. National Bulk Carriers, Inc.,* 221 F.Supp. 243, 246 (E.D.Va.1963) (award would constitute rank speculation), *aff'd,* 333 F.2d 676 (4th Cir.1964). There is nothing on these facts, however, to suggest that LeBel succumbed to anything but an agonizing death by drowning. Therefore, taking the evidence in the light most favorable to plaintiffs, this Court may reasonably infer that LeBel was conscious for some period of time prior to his death.

Furthermore, courts have allowed recovery for conscious pain and suffering where the decedents were seen alive just prior to the capsizing, although there was no direct evidence of their deaths. *See Anderson v. Whittaker Corp.,* 894 F.2d 804, 814 (6th Cir.1990); *United States Steel Corp.,* 436 F.2d at 1275; *In re Risdal & Anderson, Inc.,* 291 F.Supp. 353, 359 (D.Mass.1968); *In re Marina Mercante Nicaraguense, S.A.,* 248 F.Supp. 15, 28 (S.D.N.Y.1965), *modified,* 364 F.2d 118 (2d Cir.1966), *cert. denied,* 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967); *see also P & E Boat Rentals,* 872 F.2d at 650. In *Whittaker Corp.* the court concluded that the decedents were trapped below deck when the ship sank because their bodies were never recovered, despite evidence of their attempt to escape the vessel. 894 F.2d at 814; *accord United States Steel Corp.,* 436 F.2d at 1275–76. In the present case LeBel was last seen below deck around 3:00 a.m., shortly before the squall arose, and his body was never recovered. The Court may reasonably infer from these circumstances that LeBel was trapped below deck when the ship capsized. Furthermore, the pain and suffering award need not be limited to the actual moments of drowning. A person on a ship in a raging storm undoubtedly experiences extreme terror even before the ship capsizes. *Whittaker Corp.,* 894 F.2d at 814; *Risdal & Anderson,* 291 F.Supp. at 359.

Accordingly, this Court holds that there is sufficient evidence to withstand ASTA's motion for summary judgment.

**2.** This Court need not determine the propriety of plaintiffs' Jones Act claims as these claims were not advanced against ASTA. Furthermore,

### C. *Plaintiffs' Right to Trial by Jury*

■ Plaintiffs have demanded a trial by jury for all claims presented, to which ASTA objects. Admiralty claims, including those for conscious pain and suffering, and DOHSA claims are generally tried by the Court sitting without a jury. 46 U.S.C. § 761 (DOHSA action brought as one "in admiralty"); Fed.R.Civ.P. 38(e) (no right to jury in admiralty case). Plaintiffs assert, however, that the inclusion of Jones Act claims against some of the other defendants permits the entire case to be tried before a jury. 46 U.S.C. § 688 (Jones Act expressly permits trial by jury).[2]

Some courts have permitted a jury trial on all claims when one defendant was entitled to a jury trial by virtue of Jones Act claims but a second defendant was not. *See Woosley v. Mike Hooks, Inc.,* 603 F.Supp. 1190, 1192–93 (W.D.La.1985); *Diodato v. Turecamo Coastal & Harbor Towing, Inc.,* 100 F.R.D. 756, 757–58 (S.D.N.Y. 1984); *see also Red Star Towing & Transp. Co. v. The "Ming Giant",* 552 F.Supp. 367, 374–75 (S.D.N.Y.1982); *accord Favaloro v. S/S Golden Gate,* 687 F.Supp. 475, 481 (N.D.Cal.1987). This Court concludes, however, that the issue has been settled, especially in this case, by the holding in *Heath,* 644 F.Supp. at 1471–72. After determining that Jones Act claims could not be asserted against ASTA, the *Heath* Court stated:

Thus, there are no remaining claims triable by jury implicating the movants upon which the proposed jury interposition can be piggybacked.... Accordingly, there is no enduring foundation, even on the plaintiffs' theory of the matter, upon which the structure of their jury claim can stand vis-a-vis the petitioning defendants. The motion to strike must therefore be granted, and a nonjury pretrial order entered.

*Id.* at 1472. In a related footnote the Court stated:

that issue was decided in ASTA's favor in *Heath,* 644 F.Supp. at 1468.

The plaintiffs, of course, may yet have a viable Jones Act claim against the owners of the Marques.... If that proves so, some severance or bifurcation order may be appropriate in the future to preserve an entitlement to trial by jury on that foray.

*Id.* at 1472 n. 10.

Accordingly, this Court grants ASTA's motion to strike plaintiffs' jury trial claims as asserted against ASTA.

## II. LLOYD'S MOTION FOR SUMMARY JUDGMENT

In their amended complaint plaintiffs allege the following:

[T]he defendant Lloyd's induced prospective sailors, including plaintiffs' decedents, to sail on the S/V MARQUES by permitting the use of its name on promotional literature for the vessel and for the 1984 "Cutty Sark International Tall Ships Race", by giving certification of its insurance coverage on the S/V MARQUES to plaintiffs' decedents and the minor decedent's parents, representing to them that the vessel was safe, seaworthy, manned by an experienced and adequately trained crew and that it passed insurer's safety inspections and surveys, when it knew, or in the exercise of due care should have known, that the vessel was unsafe, unseaworthy and improperly manned, thereby negligently causing the drowning of the decedents.

(Pls.' Am.Compl. ¶ 8.) Plaintiffs also assert that Lloyd's is liable for failing to prevent others from misusing its trade name and for the negligence of the insurance underwriter of the S/V MARQUES. Lloyd's has moved for summary judgment on all counts. To determine the liability of Lloyd's for the deaths of McAleer and Le-Bel, the Court begins with a review of the origins and identity of Lloyd's.

### A. *History of Lloyd's*

The Society of Lloyd's, as it is properly called, is a self-regulated insurance market in which groups of individual insurance underwriters join together in syndicates for administrative convenience. It is a non-profit entity funded entirely by its members. Lloyd's originated in the late 17th century in a London coffee house run by Edward Lloyd, where ship owners, ship captains, and individual underwriters congregated to buy and sell marine insurance. Incorporated in 1871 and continuing to the present, this marketplace of underwriters has expanded to insure nonmarine risks as well.

Whereas other British insurers are incorporated by law and regulated by the Department of Trade and Industry, Lloyd's has retained its unique market structure and self-regulation pursuant to the Lloyd's Acts, 1871–1982, special statutes passed by Parliament. Liability under the Lloyd's Acts is several, not joint. Each underwriter is individually liable for its share of the loss, and no underwriter may be held liable for the losses of any other underwriter. No one, not even Lloyd's, can require an underwriter to undertake a particular risk, nor can anyone dictate to an underwriter the terms of insurance or payment on a claim.

In 1982 the self-regulating responsibilities of Lloyd's were expanded and certain functions were vested in a new body known as the Council of Lloyd's. The Corporation of Lloyd's was then established as the administrative body:

The Corporation of Lloyd's provides a physical site for the sale of insurance by underwriters that are members of the Corporation, together with support and incidental services to member underwriters. Lloyd's corporate committee, elected by members from among their number, administers matters of common interest to members. For example, the committee manages the affairs of the corporation, maintains the premises where insurance is sold and the facilities there. It directs accountancy, intelligence and newspaper services. An office under its direction prepares individual insurance policies based upon the terms upon which insurers and insured contract. Another office handles policy claims evaluations referred to it. Yet another office examines the credentials

of insurance brokers who seek the right to place insurance at Lloyd's.

*The Corporation of Lloyd's never sells insurance itself and is not at risk on the insurance sold on the floor at Lloyd's.*

*Edinburgh Assurance Co. v. R.L. Burns Corp.,* 479 F.Supp. 138, 144 (C.D.Cal.1979) (emphasis added), *aff'd,* 669 F.2d 1259 (9th Cir.1982). According to Peter Roy Judges, a senior manager for the Corporation of Lloyd's, Lloyd's does not conduct any insurance business. Lloyd's does not underwrite risks, issue policies, receive or collect premiums, or pay claims. Lloyd's does not procure business for any underwriter or syndicate in the market, does not enter into or negotiate insurance contracts with insurance agents or brokers, and does not engage in commercial undertakings or promotional activities related to insurance. All insurance business conducted in the Lloyd's market is undertaken by the individual underwriters and their syndicates, not by Lloyd's. (Judges Aff., Def.'s Mem. in Supp.Ex. A at 4.) In essence Lloyd's resembles the New York Stock Exchange, which houses and regulates its member stockbrokers but takes no part in the trading of securities.

In order to acquire insurance at Lloyd's one must proceed through a London insurance broker approved to do business at Lloyd's. The Lloyd's broker shops the risk around the market from syndicate to syndicate until one or more syndicates agree to cover the risk in its entirety. *Id.* At the time of the incident here involved, the Yachtsman Syndicate ("Yachtsman"), an underwriter at Lloyd's, had insured the S/V MARQUES. After the tragedy Yachtsman paid on several claims against the policy until all available funds were exhausted. Consequently, plaintiffs have brought suit against Lloyd's.

One final word about the registration of the S/V MARQUES before turning to the issues at hand. Lloyd's Register of Shipping ("LRS") is one of the leading ship classification societies in the world. It was founded in 1760 and later incorporated under the Industrial and Provident Societies Act of 1965. LRS' Register of Ships provides information about the classification status of some 76,000 ships in the world's merchant fleet. Its surveyors verify that ships are built and maintained in accordance with LRS' Rules and Regulations. The S/V MARQUES last appeared in LRS' Register of Yachts in 1980.

A June 1990 LRS marketing brochure stated the following:

The name's the same ... but not the organisation. [LRS] does not actually register ships—that is done by governmental authorities. Nor is Lloyd's Register concerned with insurance—for although Lloyd's of London, the international insurance market with whom we are frequently confused, has the same historical origin—our activities are dissimilar.

(Def.'s Mem. in Supp.Ex.C.) LRS is unaffiliated with the Society of Lloyd's insurance market and shares no rights or responsibilities with Lloyd's.

### B. *Lloyd's Liability*

As stated above, plaintiffs assert several theories of liability against Lloyd's. After reviewing these claims, this Court finds that Lloyd's is entitled to summary judgment on all counts.

### 1. No Representations Made or Authorized by Lloyd's

▪ Plaintiffs first assert that Lloyd's made certain representations regarding the safety of the S/V MARQUES in the promotional documents that plaintiffs' decedents received, thereby inducing the decedents to embark upon the voyage as sail trainees. The literature and statements in question were as follows:

(1) Two copies of the S.V. MARQUES Specifications: "INSURANCE ... *Through Lloyd's*" (dated August 1983 and January 1984) (Def.'s Mem. in Supp.Ex.D, E) (emphasis added).

(2) Brochure of The China Clipper Society, A Tradewind Voyage on the 'MARQUES' AND 'CUIDAD DE INCA': "The ships are *registered through Lloyds* and are fully covered for ma-

rine risks including third party liability" (Def.'s Mem. in Supp.Ex.F) (emphasis added).

(3) Two copies of The China Clipper Society News containing advertisements for Ocean Brokers, Ltd., offering "Cost effective *Lloyd's policies*" for ships including the· MARQUES (one dated Autumn 1983, one undated) (Def.'s Mem. in Supp.Ex. G, H) (emphasis added).

For the reasons that follow, this theory of liability must fail.

First, there is no evidence that Lloyd's participated in creating the promotional literature. As described above, the involvement of Lloyd's in this tragic endeavor was limited to providing administrative support to Yachtsman. Hardy LeBel, father of decedent Thomas LeBel, admitted in his deposition that he did not believe that Lloyd's had actually ordered or authorized its name to be used in these advertisements and brochures. Nevertheless, he inferred the requisite knowledge and authorization from Lloyd's failure to disavow the misuse of its trade name *after* the tragedy occurred. (LeBel Dep., Def.'s Mem. in Supp. Ex. J at 44.) As discussed below, however, such after-the-fact failure to disavow provides no basis for liability. Furthermore, LeBel's admission supports the claim that Lloyd's had no actual knowledge of these representations. Accordingly, Lloyd's cannot be held responsible for any representations that third parties made to plaintiffs and their decedents.

## 2. No Negligent Misrepresentations Made

█ Plaintiffs' next theory of liability reduces to the following syllogism:

(1) Lloyd's made or authorized the making of various statements in the five promotional documents in order to induce plaintiffs' decedents to sail on the S/V MARQUES;

(2) Plaintiffs' decedents relied upon such inducements in deciding to sail;

(3) The S/V MARQUES was not seaworthy because it sank;

(4) Therefore, Lloyd's made negligent misrepresentations regarding the safety of the vessel.

As determined above, Lloyd's did not make or authorize the making of the statements contained in the promotional literature. Furthermore, none of the five items mentioned above states that Lloyd's found the ship to be seaworthy or verified its proper inspection, and all the statements made were basically true. Plaintiffs unfortunately ascribed to these statements more meaning than the promoters intended, but Lloyd's cannot be held liable for that.

First, the literature correctly stated that the S/V MARQUES was insured "through Lloyd's"—although not insured by Lloyd's nor by any agent of Lloyd's—because Yachtsman was a member of the Lloyd's insurance market. Second, the S/V MARQUES was "registered through Lloyd's," although this reference designated LRS's Register of Yachts, not the Society of Lloyd's insurance market. Finally, the descriptive term "Lloyd's policies" denotes a type of insurance sold by the underwriters at Lloyd's, to which Lloyd's lends its name but undertakes no personal liability. Accordingly, this Court finds that no negligent misrepresentations were made.[3]

## 3. No Negligent Failure to Protect Against Misuse of Trade Name

█ Plaintiffs next assert that Lloyd's breached its duty to protect plaintiffs from third parties who improperly used the powerful Lloyd's trade name. Plaintiffs claim that because Lloyd's had previously sought to curtail misuse of its name in 1961, Lloyd's forever owes a duty to prevent such misuse, although this duty would extend only to those who foreseeably relied upon the misuse, as plaintiffs did. This

---

**3.** There may be a question of fact regarding whether plaintiffs' decedents actually relied upon the promotional literature prior to their registration. *Kommanvittselskapet Harwi (Rolf Wigand) v. United States,* 467 F.2d 456, 459 (3d Cir.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973); Restatement (Second) of Torts § 311 (1965). There is some evidence that the literature was received after the sail trainees registered. Nevertheless, this issue alone cannot save plaintiffs' theory of negligent misrepresentation.

alleged duty, however, is only one of self-interest. Lloyd's has a corporate stake in preserving the value and meaning of its name and in ensuring that others do not profit by promoting themselves as affiliates of Lloyd's. *See* Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a) (West Supp.1992). This is not a duty that runs to plaintiffs, even if they were among those who foreseeably relied. *See McKeithen v. The S.S. Frosta,* 441 F.Supp. 1213, 1216 (E.D.La. 1977) (no duty to control third party unless special relationship exists between defendant and third party or between defendant and plaintiff).

Furthermore, none of the five promotional documents used the phrase "Lloyd's of London," which is the accepted trade name of Lloyd's. Instead, they used only the term "Lloyd's." This term accurately referenced both the Society of Lloyd's and Lloyd's Register of Shipping. Although plaintiffs mistakenly interpreted these references as designating a single entity, there is no evidence that the promoters created this misconception. Accordingly, Lloyd's is not liable on this theory.

4. No Grounds for Vicarious Liability

■■■■■ Plaintiffs next contend that Lloyd's was vicariously liable for Yachtsman's negligence in inspecting the S/V MARQUES prior to insuring it because Lloyd's had sufficient control over Yachtsman, as evidenced by Yachtsman's use of the Lloyd's trade name in its advertising. This argument, too, must fail.

First, as discussed above, Lloyd's never granted permission to Yachtsman, either expressly or impliedly, to use its trade name. Second, there is no basis for an agency relationship between Lloyd's and Yachtsman. An agency relationship requires evidence of some grant of authority from the principal to the agent. Restatement (Second) of Agency § 26 (1958). In this case there was no contract between Lloyd's and Yachtsman for the issuance of insurance. As previously stated, Lloyd's does not sell insurance or employ others to sell insurance for it. Furthermore, Lloyd's has never manifested such a grant of au-

thority to Yachtsman, nor can such authority be inferred from these circumstances. Therefore, Yachtsman was not an agent of Lloyd's in this context.

Plaintiffs assert in the alternative that if Yachtsman did not have actual authority to act as agent for Lloyd's, then Yachtsman had apparent authority to do so.

To establish the apparent authority of an agent to do a certain act, facts must be shown that the principal has manifestly consented to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; that a third person knew of the fact and, acting in good faith, had reason to believe and did actually believe that the agent possessed such authority; and that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal. *Soar v. National Football League Players Ass'n,* 438 F.Supp. 337, 342 (D.R.I.1975), *aff'd,* 550 F.2d 1287 (1st Cir.1977). Thus, apparent authority is controlled not by what the principal manifests to the agent, nor by what the agent does or says, but by what the principal manifests to the third party and what the third party reasonably believes. *Restatement (Second) of Agency* § 27 (1958). Plaintiffs cannot establish apparent authority on these facts because Lloyd's had no contact with plaintiffs or their decedents prior to the tragedy. Nor can the decedents' misinterpretation of the promotional literature amount to such a manifestation by Lloyd's. Furthermore, the failure of Lloyd's to deny an agency relationship after the incident did not amount to a manifestation of authority. Lloyd's could not have been expected to refute plaintiffs' misconceptions because Lloyd's had no knowledge that plaintiffs were operating under such beliefs.

Accordingly, this Court concludes that there was no agency relationship of any kind and no grant of apparent authority to Yachtsman. Even if this Court were to find that actual or apparent authority existed, Yachtsman's alleged failure to properly

inspect the vessel did not amount to a breach of duty that ran to plaintiffs or their decedents. Proper inspection might have alerted Yachtsman to an unsatisfactory situation, but an insurer is generally not liable for underwriting a foolhardy risk.

Finally, because no agency relationship existed, Lloyd's cannot be held vicariously liable for the negligence of those who permitted the S/V MARQUES to sail in American waters when it was insured only for British waters.

### III. CONCLUSION AND ORDER

For the foregoing reasons ASTA's motion for partial summary judgment is denied; ASTA's motion to strike plaintiff's demand for a jury trial is granted; and Lloyd's motion for summary judgment on all counts is granted.

It is so ordered.