Edward McALEER, Administrator of the Estate of James F. McAleer, Hardy Lebel and Joan Lebel, Administrators of the Estate of Thomas Lebel, Plaintiffs,

v.

Traver C. SMITH, Jr., Administrator of the Estate of Stuart A. Finlay, Mark Shirley Portal Litchfield, and Robin Patrick Cecil–Wright d/b/a The China Clipper Society, Berry Brothers and Rudd Ltd. d/b/a Cutty Sark, American Training Association and Lloyds of London, Defendants.

Civ. A. No. 88–0544L.

United States District Court, D. Rhode Island.

Aug. 16, 1994.

Edmund M. Pitts, Brookline, MA, for plaintiffs.

A. Lauriston Parks, III, Hanson, Curran, Parks & Whitman, Providence, RI, Richard H. Pettingell, Pettingell & Regan, Boston, MA, for American Sail Training Assn.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court for decision following a bench trial. This is the fifth opinion that this Court has published in this case.

Plaintiffs Edward McAleer, administrator of the estate of James F. McAleer, and Hardy and Joan LeBel, administrators of the estate of Thomas LeBel, brought this action against the American Sail Training Association ("ASTA") and others for the alleged wrongful deaths of their decedents, James F. McAleer and Thomas LeBel. Edward McAleer is the brother of James F. McAleer, and

Hardy and Joan LeBel are the parents of Thomas LeBel.

ASTA is the only party defending the case at this time. Plaintiffs' claims against ASTA are for damages under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 761–767,[1] and under the general maritime law for the conscious pain and suffering of their decedents resulting from the alleged negligence of ASTA. *See McAleer v. Smith,* 791 F.Supp. 923, 925–930 (D.R.I.1992) (denying ASTA's motion for summary judgment on the conscious pain and suffering claims).

## I. Background

This suit arises out of the tragic sinking of a 67–year–old tall ship, the auxiliary barque MARQUES, on the high seas 80 miles northeast of Bermuda in the early morning hours of June 3, 1984. At the time of the mishap, the vessel was participating in the much-heralded "Cutty Sark International Tall Ships Race" ("Tall Ships Race") from Bermuda to Halifax, Nova Scotia. Plaintiffs' decedents, James F. McAleer and Thomas LeBel, were sail trainees on the vessel who perished along with Captain Stuart A. Finlay, his wife and 16–month–old son, and 14 of the 23 other persons on board. In short, 19 of the 28 persons on board went down with the vessel. At the time of the loss, the MARQUES was manned by a permanent crew of nine plus the captain and a supplemental crew consisting of two ASTA counsellors and 16 sail trainees (ten recruited by ASTA from the United States, and six recruited by Finlay from Antigua).

Plaintiffs' decedents were on board the MARQUES through an arrangement Mark Shirley Portal Litchfield of the United Kingdom made with defendant ASTA, a non-profit Rhode Island corporation established in 1973 to solicit and supervise sail trainees.[2] ASTA is based in Newport, Rhode Island

---

**1.** The Death on the High Seas Act ("DOHSA"), 46 U.S.C.App. § 761 (1988), provides that:

Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas ... the personal representative of the decedent may maintain a suit for damages ... for the exclusive benefit of the decedent's wife, husband, parent, child, or

dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

**2.** In 1984 ASTA was a non-business corporation, and in 1985 ASTA became a non-profit corporation.

and has a total membership of approximately 300 people, some two dozen of whom serve on its board of directors. The board carries out general policy oversight. ASTA's day-to-day operations are the responsibility of its executive director, a post held at all times material hereto by George W. Crowninshield. Crowninshield, a retired United States Navy captain, and a pair of clerical workers are the organization's only paid employees. Most of ASTA's work is funneled through numerous volunteers.

ASTA sponsors races and competitions, and also places individuals on deepwater sailing ships for what is called "sail training." Interested persons apply, pay a fee, and are placed aboard ship for a finite period, usually coincident with the duration of a particular race. While aboard, "trainees" assist in the ship's work, learning both by observing and by doing. The program is an effort to provide participants with a unique, hands-on sailing experience.

Litchfield and Robin Patrick Cecil–Wright, also of the United Kingdom, were co-owners of the MARQUES in 1983 and 1984 since they were equal partners in the China Clipper Society ("China Clipper"), a British unincorporated holding company that held title to the MARQUES and her sister vessel, the INCA.[3] China Clipper maintained a promotional office in Newport, Rhode Island from April 1983 to April 1984. The Newport office was established to promote the commercial services of the MARQUES and the INCA, including their use as sail training vessels. To this end, Litchfield, on behalf of

China Clipper, negotiated a contract with ASTA whereby ASTA would solicit and process applications for participation in the June 1984 Tall Ships Race which was being organized by ASTA and its British counterpart, the Sail Training Association ("STA").[4]

As a condition to its association with ASTA, China Clipper agreed to abide by various ASTA requirements. These included comprehensive ASTA maintenance and sailing instructions, the presence aboard ship of two unpaid ASTA sailing counsellors to supervise trainees and serve as liaisons between the trainees and the captain, and the provision of liability insurance in stipulated minimum amounts. In the "letter agreement" entered into between ASTA and China Clipper, China Clipper also agreed, through Litchfield, to "provide disciplined, orderly, clean and safe ships for the ASTA cruises."[5]

From the commencement of the contract period on April 16, 1983 until the loss of the MARQUES, ASTA administered the sail training program on behalf of China Clipper.[6] Under the agreement, ASTA promised to use its best efforts to recruit trainees for the Bermuda-to-Halifax voyage of the MARQUES. To this end, ASTA placed advertisements in sailing magazines, distributed literature on college campuses, and provided information to potential trainees at its Newport office. ASTA then processed trainee applications, registrations and payments, forwarding the bulk of the money collected to the owners, while retaining only certain reimbursements and $50 per trainee to cover adminis-

3. Early on in this litigation, Cecil–Wright disputed that he was a co-owner of the vessel at the time Litchfield made an agreement with ASTA and at the time of the sinking, but the Court determined that was an issue to be decided at trial, see *McAleer v. Smith*, 715 F.Supp. 1153, 1158–1159 (D.R.I.1989) and 728 F.Supp. 857 (D.R.I.1990). Subsequently, Cecil–Wright discharged his attorney and later was defaulted in this case and, thus, it is assumed for purposes of this decision that he was an owner along with Litchfield at all times material to this case.

4. STA was formed in 1956 to organize and run international sail training races. STA and ASTA work closely together as their cooperation in the 1984 Tall Ships program demonstrates.

5. In addition to making these assurances to ASTA, Litchfield represented in China Clipper's application for entry in the 1984 Tall Ships Race that the MARQUES was seaworthy and in compliance with British nautical safety standards.

6. Litchfield had attempted to enter into an arrangement with ASTA prior to 1984. In March of 1983, Litchfield visited the United States and met with Vice–Admiral Weschler, Membership Committee Chairman of ASTA. The two discussed the use of China Clipper's vessels for sail training in the United States, but Litchfield was told his ships would need to be licensed by the British government to carry passengers before ASTA would cooperate.

trative expenses.[7]

In return for payment of their fees, sail trainees were given the experience of working as crew members on a tall ship. Trainees were assigned to the round-the-clock watch schedule in the same frequency and rotation as the regular crew members, and they were listed on the MARQUES' "race list" as supplemental crew. Even when off watch, trainees were liable to be called to help handle the vessel. As volunteers they were given some input into the particular duties they would perform, but generally the duties were those of the regular crew, including handling ropes and lines, furling sails, helping out in the galley and below deck and performing routine chores.

In April of 1984, ASTA received a "Sail Training Cruise Registration Form" from Hardy LeBel and a "Cruise Application" from Thomas LeBel, seeking passage for Thomas LeBel, a 15–year–old student, aboard the MARQUES during the race from Bermuda to Halifax. Plaintiffs Hardy and Joan LeBel had a family membership in ASTA in 1983 and 1984. ASTA received similar documents the same month from James F. McAleer, a 46–year–old bachelor, seeking passage aboard the MARQUES in the same race. As a result, both Thomas LeBel and James F. McAleer were assigned as sail trainees aboard the MARQUES when it started the race in Bermuda on June 2, 1984.

At the time of the sinking, the MARQUES was a 117–foot, three-masted, wooden square-rigged sailing ship. Her history is interesting. She was originally built as a trading schooner in Valencia, Spain around 1917. She sailed the Mediterranean for many years. In 1928, she was fitted with an engine and a single propeller. It is believed that she was badly damaged during the Spanish Civil War in the 1930's. In 1945, she was largely rebuilt and resumed carrying cargo. In 1958, the ship was described as "a sailing and motor vessel with two masts." In 1960 she was fitted with twin screws and by 1962 was no longer used as a sailing ship.

In 1971, Cecil–Wright found the vessel in Palma, Majorca. He had been looking for a wooden sailing ship for filmmaking and pleasure cruising. She was surveyed by John E. Perryman, a naval architect/surveyor (as he described himself) and refitted and rerigged into a sailing ship again by Cecil–Wright after he purchased the boat in 1972. He rigged the vessel as a Polacca brigantine with a topgallant, topsail and fore course on her fore mast and a gaff rigged main sail and topsail on the main mast. Both the foremast and main mast had three stay sails. There were three deck hatches including the original cargo hatch.

Between 1974 and 1976, the MARQUES was featured in several films. In 1976, she was converted to resemble HMS BEAGLE, the vessel which carried Charles Darwin to the Galapagos Islands, for a BBC filming project. She was re-rigged and refitted as a three-masted barque with topgallants, topsails and courses on the fore and main masts. A mizzen mast was added and a low poop house was constructed for cosmetic purposes. These changes increased the top weight of the vessel. In 1979, while this project was underway, Litchfield joined the endeavor.

In late July 1977, with 17 persons aboard and Cecil–Wright in command, the vessel started her trek to recreate the voyage of Charles Darwin. Litchfield took over as captain in December of 1977. In all, the voyage covered 20,000 miles around South America, through the Straits of Magellan to the Galapagos Islands and back to England through the Panama Canal. In 1978, she did further film work in the United Kingdom and participated in the Tall Ships Race to Oslo with Litchfield at the helm.

In 1979, the MARQUES underwent a five-month refit when a new, lighter but higher poop house was built. During the remainder of 1979, she was engaged in carrying paying parties in and around the coast of the British Isles. In 1980, she spent seven months in the Canary Islands operating two-week natural history cruises.

During the winter of 1981/1982, she was brought to Barbate, Spain to be refitted for a

7. Between the initial application fee and the deposit upon acceptance into the sail training program, each trainee paid a total of $650 to ASTA, $600 of which was remitted to China Clipper.

film contract. The fore and main masts were extended by about eight feet to take Royal sails. Stunsails were also added. The film contract fell through and during the summer of 1981 she cruised the Mediterranean where she encountered a serious storm with Litchfield in command. The vessel underwent structural repairs in Barbate from November 1981 to January 1982. During the remainder of 1982, she participated in "Clipper Challenge" races and other one day races out of ports in the United Kingdom carrying school children.

In 1983, the ship sailed to the Canary Islands and then across the Atlantic to Antigua. She spent the winter of 1983–84 there being used for sail training and day cruises before departing in April, 1984 for Puerto Rico and the first leg of the Tall Ships Race to be sailed from San Juan to Bermuda. At all times material hereto, she was of British flag and registry, operating pursuant to certification issued by the British Department of Transport.

James F. McAleer and Thomas LeBel boarded ship on Friday, June 1, 1984 in Hamilton, Bermuda. That evening (the night before the race began), all ten ASTA trainees and the two ASTA counsellors attended an all-hands meeting aboard ship. The 45–minute meeting was conducted by Stuart Finlay, the captain of the MARQUES. Topics covered included the chain of command, duties of the trainees, allocation of the watches, ship functions, and safety matters such as fire and boat drills, abandon ship procedures and the position each person was to muster in the event of an emergency. Attention was drawn to the ship's regulations and where they could be read. After the meeting, the mates showed the trainees their muster positions and explained further details of the ship. The next morning the trainees met at their respective watch stations for a further briefing on the ship's routines.

Ten ships, including the MARQUES, began the race outside the harbor at Hamilton, Bermuda on the afternoon of June 2.[8] The MARQUES crossed the starting line under full sail at approximately 4:00 p.m. The weather was well suited to sailing: bright and clear, with a crisp fifteen-knot wind out of the west southwest and three- to four-foot seas. There was an awkward swell variously described as "confused", "rough" or "lumpy" that was attributed to a cold front that had passed through the previous night. At midnight, the weather remained clear. The wind, which had been steady at 15 to 20 knots, increased to 22 to 27 knots, and the seas were approximately ten feet. The MARQUES was moving at roughly five knots and her speed was increasing.

Toward 4:00 a.m. on June 3, the weather changed. The wind picked up, and a steady downpour began. Suddenly, the rain became fierce, almost torrential, and the wind intensified. The MARQUES was caught in an unforecasted line squall. Without warning, the ship was hit broadside by a gust of wind of hurricane or near hurricane force. The MARQUES slowed and was slammed over on her starboard side. She began taking on water through the deck hatches that were then half submerged. As she filled, she started to settle back upright but was blown back down again. According to survivor John N. Ash, a geologist with the New Jersey Department of Environmental Protection, the MARQUES then plunged bow first, sinking "like a saucer in dishwater" within 30 to 45 seconds after Ash had freed himself from the rigging in which he had become entangled, and righting herself as she went under.[9] Of the 28 persons aboard the MARQUES, 19 went down with the ship. The 9 survivors reached either a rubber zodiac din-

---

8. The INCA did not make it to the starting line because it had suffered damage to its rudder in the squall of the night before in port. Hardy LeBel, Jr., the older brother of Thomas LeBel, was a sail trainee aboard that vessel.

9. Survivor Stuart Gillespie testified that the MARQUES sank approximately 45 to 60 seconds after being rolled over, while survivor Cliff McMillan told the Bermuda Police that the

"whole ordeal of the boat sinking took only about 30 seconds from the time that the boat went on its side to the time it went right under." McMillan later testified at trial that it took between 45 and 60 seconds from the moment of capsize to sinking. In any case, it is clear that the vessel sank within one to two minutes of being blown over.

ghy or a 20–man life raft that had surfaced and inflated.

Following the loss of the MARQUES, the British Secretary of State for Transport called for a formal investigation into the tragedy. An investigation was initiated under the British Merchant Shipping Act with the formation of the Wreck Commission (officially called The Court of Formal Investigation). Richard Stone Q.C., a barrister in admiralty, was designated as judge and he was assisted by two assessors, Captain E.G. Venables (a master mariner) and B.N. Baxter (a naval architect). After extensive presentation of evidence over a period of 64 days between October 14, 1985 and March 23, 1987, the Wreck Commission issued a report setting forth its findings and recommendations on April 23, 1987. The 86–page report, hereafter referred to as the "Wreck Commission Report," concluded that the sinking of the MARQUES was "caused by an unexpected and violent squall, probably in the nature of a down draught superimposed on a line squall, resulting in the severe heeling, down-flooding and sinking" of the vessel. The Commission also concluded that: "[I]t was not the fault of any person or persons that the MARQUES had insufficient stability to resist the said squall...."

In March of 1987, plaintiffs, as administrators of the estates of James F. McAleer and Thomas LeBel, brought this suit in the District Court for the District of Massachusetts against: Traver C. Smith, administrator of the estate of Stuart A. Finlay, the Captain of the MARQUES; alleged owners Mark Litchfield and Robin Cecil–Wright d/b/a the China Clipper Society; Goods Export Ltd. d/b/a the China Clipper Society; Berry Brothers and Rudd, Ltd., the British distiller of Cutty Sark Scotch Whiskey which sponsored the June 1984 Bermuda-to-Halifax race as the "Cutty Sark International Tall Ships Race"; Lloyds of London, the British insurance underwriting society; and ASTA. Plaintiffs sought recovery under the Jones Act, 46 U.S.C.App. § 688, the general maritime law of negligence and unseaworthiness, and the Death on the High Seas Act, 46 U.S.C.App. §§ 761–767, for the personal injuries, conscious pain and suffering, and deaths of their decedents. (Plaintiffs' amended complaint also included several counts of deceit and breach of warranty against some of the defendants.) After a hearing, Judge Walter Jay Skinner of the District of Massachusetts entered an order transferring the case to this Court on September 7, 1988.

As mentioned, ASTA is the only remaining defendant. Defendants Litchfield and Cecil–Wright have been defaulted,[10] defendant Smith and defendant Lloyds of London were granted summary judgment, see *McAleer v. Smith,* 791 F.Supp. 923 (D.R.I.1992) and 818 F.Supp. 486 (D.R.I.1993), defendant Berry Brothers and Rudd, Ltd. settled, and the complaint against defendant Goods Export was dismissed for lack of personal jurisdiction. See *McAleer v. Smith,* 715 F.Supp. at 1158–59.

After a bench trial which started on June 21, 1993 and extended over fifteen trial days, the Court took the matter under advisement. The Court has poured over the extensive material submitted for the better part of a year and finally the case is in order for decision.

## II. Discussion

### A. Did ASTA Owe Trainees a Duty of Care?

In paragraph seven of their Amended Complaint, plaintiffs alleged that ASTA negligently induced their decedents to join the MARQUES "when it knew, or should have known that the vessel was unsafe, manned by an inadequate and untrained crew, and unfit to participate" in the sail training race. Essentially, plaintiffs claim that ASTA should be held liable for any unseaworthiness of the MARQUES or any deficiency in the abilities and activities of its captain and regular crew.

---

**10.** After this Court denied the motions of Litchfield and Cecil–Wright to dismiss for lack of personal jurisdiction, they discharged their attorneys and became *pro se* defendants and did not participate in any further proceedings. Obviously, it was their strategy to allow a default judgment to be entered against them and then relitigate the question of jurisdiction in the English courts when plaintiffs go there to recover the judgment.

In determining whether ASTA may be held liable for any unseaworthiness or lack of stability on the part of the MARQUES, it is first necessary to examine the relationship of ASTA to the sail trainees. A threshold issue is whether ASTA owed a duty of due care to prospective sail trainees in the selection and approval of the vessels on which they would train. *See, e.g., Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).

ASTA has attempted to analogize its role to that of a travel agency. Courts have generally declined to impose liability on travel agents and tour operators for injuries sustained by clients aboard vessels, buses and other modes of transportation or at hotels or other destinations. The courts have usually found that there never existed a relationship which would have given rise to a duty on the part of the travel agent to investigate the safety of instrumentalities over which it had no control or knowledge. *See, e.g., Ross v. Trans Nat'l Travel,* 1990 WL 79229 (D.Mass. 1990); *Lavine v. General Mills, Inc.,* 519 F.Supp. 332 (N.D.Ga.1981); *Connolly v. Samuelson,* 671 F.Supp. 1312, 1317 (D.Kan. 1987). *See also Wilson v. American Trans. Air, Inc.,* 874 F.2d 386, 390 (1989), *aff'd in part and remanded on other grounds,* 916 F.2d 1239 (7th Cir.1990). This is so because the sole function of the travel agent is "to sell and arrange travel tours for those who might wish to purchase them." *Lavine,* 519 F.Supp. at 337.

ASTA, however, has a more extensive relationship with sail trainees than a travel agent has with a client. In *Heath v. American Sail Training Ass'n,* 644 F.Supp. 1459, 1470 (D.R.I.1986), Judge Bruce M. Selya (then a district judge) found that "ASTA operated what amounted to a placement service. For a fee, it matched individuals with sailing ships for particular cruises." In addition to being a placement agency for sail trainees, however, ASTA also provided instruction through counsellors and, in this case, actively promoted the vessels and the Tall Ships Race in which they participated. In fact, ASTA co-sponsored the race along with the United Kingdom's STA, collecting and soliciting funds to support its efforts as a sponsor. ASTA also served along with STA on the Race Committee, and the race was conducted pursuant to the "Racing and Sailing Rules" of STA and ASTA. Finally, pursuant to Racing and Sailing Rule 70.(3), ASTA reserved the right to inspect safety conditions aboard the vessels and, indeed, inspected the MARQUES' safety equipment prior to the race.

■ Given ASTA's extensive relationship with sail trainees, this Court concludes that ASTA owed a duty to sail trainees to exercise due and reasonable care in choosing and approving vessels for sail training to assure that the sail trainees were placed aboard seaworthy, properly manned and safe vessels. Additionally, ASTA owed a duty to exercise reasonable care in the conduct of the Tall Ships Race so as not to increase the risks inherent in sail training.

### B. Did ASTA Breach Its Duty of Care?

The question then arises whether ASTA negligently breached its duty of care either in approving the MARQUES as a sail training vessel for the June 1984 Tall Ships Race or in its conduct of the race. Plaintiffs contend that ASTA was negligent in three ways. First, plaintiffs claim ASTA allowed a structurally unsound and unstable vessel such as the MARQUES to be used for sail training. Second, plaintiffs claim ASTA permitted an incompetent master and crew to sail the MARQUES with sail trainees aboard, thus making the vessel unseaworthy. Finally, plaintiffs contend ASTA was negligent in participating with STA as part of the Race Committee in the decision to start the race.

Analysis of the evidence in this case leads this Court to conclude that ASTA was not negligent in any manner.[11]

### 1. Stability/Structural Integrity of the MARQUES

■ With respect to the MARQUES' stability and structural soundness, the Court

---

11. Having concluded that ASTA was not negligent, this Court need not consider the validity of the exculpatory clause whereby LeBel, through his father as guardian, and McAleer, for himself, agreed to hold ASTA harmless in the event of accident or injury.

finds that ASTA was reasonable in relying upon the "Load Line Exemption Certificate" (the equivalent of a license to carry passengers) issued by the Department of Transport of the United Kingdom on November 25, 1983.

As explained in the Wreck Commission Report, sail training associations do not have the ability, given their size and resources, to inspect the structural integrity of all the vessels that carry sail trainees.[12] ASTA has a small office staffed by the executive director and two secretaries. It has neither the facilities nor the personnel to conduct marine surveys of the stability, seaworthiness or watertight integrity of sailing vessels. Vessels from as many as 122 countries compete in these races. National regulatory requirements differ and certificates of inspection are often in languages other than English. The sheer administrative task of merely checking the authenticity of certificates would be formidable. If organizers were to assume the responsibility of determining the seaworthiness of the vessel and the adequacy of the crew, they would need to implement an independent system of inspection and certification. Not only is this beyond their means, but it would be a wasteful duplication of the work of national authorities.

As a result, both ASTA and STA necessarily rely upon governmental inspections and certifications. ASTA relies on the United States Coast Guard to assess the seaworthiness of American vessels. As indicated in ASTA's Sail Training Cruise Registration Form, ASTA requires that U.S. "vessels are Coast Guard certified for safety with licensed captains" and that "[F]oreign flag vessels have compatible qualifications." In addition, STA/ASTA Racing and Sailing Rule 71.(2), entitled "Essential Equipment," requires that all vessels competing in the race "comply with the laws of their country of registration and any relevant and applicable Shipping Act or Regulations regarding safety precautions and equipment."

Further, race organizers are not in a position to warrant that owners and regulatory bodies have performed their duties by ensuring that entrants are participating with a seaworthy vessel and a competent crew. Race organizers are entitled to assume, unless they have reason to believe to the contrary, that owners and regulatory bodies have fulfilled their duty of care. To remind participants of this reality, ASTA/STA Racing and Sailing Rule 70.(1), compliance with which is a precondition to entry in the race, expressly states:

> The safety of a vessel and her crew is the sole and inescapable responsibility of the Master who must ensure that the vessel is fully found, thoroughly seaworthy and manned by a sufficient number of experienced crew who are physically fit to face heavy weather. He must be satisfied as to the soundness of the vessel. . . .

In addition, ASTA's Sail Training Cruise Registration Form contains the following statement of responsibility by which plaintiffs' decedents agreed to be bound: "I agree to hold harmless ASTA, its Officers and Directors, and the particular ship and its personnel, in case of accident or injury to the below signed participant." This provision further evidences that ASTA warrants neither the certification by any regulatory body nor the ultimate safety of any sail training vessel.

Admiralty has long recognized that the duty of a shipowner to provide a seaworthy vessel is "peculiarly and exclusively the obligation of the owner. It is one he cannot delegate." *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 100, 66 S.Ct. 872, 880, 90 L.Ed. 1099 (1946). ASTA/STA Racing and Sailing Rule 70.(1), along with the statement of responsibility in the Sail Training Cruise Registration Form, are clear reminders that the organizers are not relieving owners of their duty.

In this case, the MARQUES was flying the British flag and, therefore, had to be licensed by the British government. To be so licensed, the MARQUES needed to comply with the terms of the Merchant Shipping (Load Line) Act 1967. The Act made it an

---

12. ASTA Rule 72 requires certain safety equipment to be carried and, pursuant to ASTA Rule 70.(3), ASTA does conduct inspections to ensure that such equipment is carried and maintained.

offense for any ship registered in the United Kingdom, and not exempted under the Act, to proceed to sea without complying with the Act or the rules promulgated thereunder.

For the intended use of sail training beyond coastal waters, the MARQUES fell within the Act, no longer being exempt as a pleasure craft. While a vessel is not required by the Act to comply with particular stability criteria, vessels are required to carry stability data. The furnishing of stability data for the information of the master is a prominent feature of the Act and its related rules. With the granting of an Exemption Certificate, however, the MARQUES would be exempted from the requirement that it carry stability data.

A United Kingdom Load Line Exemption certificate was issued for the MARQUES on November 25, 1983. The Certificate stated that the vessel had been surveyed on June 1, 1983, and that the Certificate was valid until August 31, 1984.

With the issuance of the Load Line Exemption Certificate, ASTA was justifiably satisfied that the British government, through the Department of Transport, had determined that the MARQUES was structurally sound and sufficiently stable to serve as a sail training vessel and to carry passengers.[13] The duty ASTA owed sail trainees to exercise due and reasonable care in choosing and approving vessels for sail training was fulfilled at this point.

While it was not necessary for ASTA to look beyond the certification of seaworthiness by the British Department of Transport, this Court notes that any further investigation on ASTA's part would have shown that the Certificate was granted in part based upon the declaration in October of 1983 by Perryman, as the surveyor and naval architect of the owners, that in his professional opinion the MARQUES possessed adequate stability to enable her to sail on trans-Atlantic voyages.

Normally certification requires that a vessel be opened up and surveyed by a Department of Transport surveyor, including stripping off the hull planks to examine the frames. With the MARQUES, this would have entailed great expense, since the framing and keelson were concealed by tanks and bulkheads constructed of 2– to 2½–inch–thick ferro cement which would have had to be lifted out or more probably broken. To avoid this expense, Litchfield succeeded in procuring an Exemption Certificate based upon interviews with himself and his naval architect/surveyor, Perryman, as well as information from the files and survey reports.

As a precondition to the granting of the Exemption Certificate, Perryman was required to sign a declaration taking responsibility for the condition and seaworthiness of the ship. The declaration stated: "It is my professional opinion that both the MARQUES and the CIUDAD DE INCA are now in such safe and seaworthy condition and possess such adequate stability to enable them to sail on transatlantic voyages and to operate within the following geographic limits ... for the next 2 years." Perryman initially qualified the 2–year period by making it "subject to an inspection of the amidship areas fitted with ferro cement tanks within the next 12 months," but subsequently agreed to a 3–month extension, making the Exemption Certificate valid for 15 months. The Certificate was also issued subject to the following conditions: that the fittings and appliances be maintained in good working order, that a freeboard of not less than 800 mm. measured from the top of the wood deck amidship be maintained, and that not more than 12 passengers be carried at any time.

In addition to the issuance of the Exemption Certificate, other information available to ASTA would reasonably have led to the conclusion that the MARQUES was seaworthy. Both Thomas R. Weschler, a retired United States Navy Vice Admiral and a member of the Executive Committee of ASTA, and Captain George W. Crowninshield, Executive Director of ASTA, were generally aware of the activities and the reputation of the MARQUES and its owners through the publications of China Clipper

---

**13.** While plaintiffs may have criticisms of the British Department of Transport's procedures, the Department of Transport and the owners' naval architect, Perryman, on whom it relied, are not defendants in this case.

and input from various sail training devotees. Certainly, the MARQUES' participation in the 1982 "Clipper Challenge," 2½ months of one-day races from ports around the United Kingdom, was reassuring evidence that the vessel was suitable for sail training. Furthermore, ASTA volunteers Philip G. Graf and Donald L. Treworgy had been aboard the MARQUES on previous voyages, some in heavy weather. In a February 15, 1984 letter to Vice–Admiral Weschler and Commodore Henry H. Anderson, Jr., then Chairman of ASTA's Board of Directors, Graf wrote that on a voyage from Plymouth, England to the Canary Islands the vessel had survived "several days of force 8 & 9, and about a day or so of force 10." [14] At trial, Graf testified that the seas on that voyage were between 30 and 40 feet and that the winds were as great as 50 knots with gusts between 55 and 60 knots. Graf noted that the MARQUES had recovered successfully from extreme angles of heel. Graf also testified that he had a conversation with Vice–Admiral Weschler and Commodore Anderson subsequent to his letters in which he told them that in his opinion the MARQUES was seaworthy. ASTA, thus, was aware of information relevant to the MARQUES ability to perform in adverse weather.

It is also clear from the Wreck Commission Report that the MARQUES had made previous trans-Atlantic journeys of which ASTA was likely aware. For her role as the H.M.S. BEAGLE in the 1977 BBC Television production, "The Voyage of Charles Darwin," the MARQUES sailed over 20,000 miles, with winds as high as Force 8 encountered at times. Although there was some leakage which required pumping and repairs in Brazil, reports indicated that the vessel generally stood up well to the trip.

There was also evidence that the MARQUES sailed to the Canary Islands in 1980 to operate natural history cruises and en-

countered rough weather. Finally, there was evidence that in October 1981, while cruising the Mediterranean, the MARQUES was hit suddenly by a squall of great violence (estimated at Force 12) on the starboard beam. The vessel heeled to an angle of about 40 degrees, putting the bulwark rail one to two feet below water. Litchfield took over the helm and brought her out of this precarious position. ASTA, thus, had knowledge of the MARQUES' ability to brave the rough weather often encountered on the high seas.

At trial, plaintiffs presented extensive stability data developed by Commander William Murray Peterson, a naval architect from South Bristol, Maine, whose sister, Susan Howell, was an ASTA counsellor lost in the sinking of the MARQUES, and Roger Whitney Long, a vice president of Woodin & Marean, Inc., a naval architectural firm. This data *suggested* that the MARQUES was in the lower spectrum of stability and *could* pose a risk in certain weather conditions. However, the research which formed the basis of the Woodin & Marean data was not initiated until after the loss of the MARQUES, and even then it was based on questionable assumptions and estimates and not on actual measurements.

The fact remains that no naval architect has ever opined that this vessel was unstable under any accepted standards in the field. Furthermore, as the Wreck Commission Report noted, review of the stability data of the vessel that most resembled the MARQUES at the time indicates that a survey of the MARQUES would not have led to the conclusion that the vessel was unseaworthy. The measure of stability possessed by the MARQUES was not so low as to have resulted in the ship being declared unseaworthy.

It is possible that had the master been provided with proper stability information for the MARQUES, such information *might* have included a warning that the range of

14. On the Beaufort Scale, a Force 4 classification is assigned to wind speeds of 11 to 16 knots; a Force 5 designation is ascribed to winds between 17 and 21 knots; a Force 6 designation is ascribed to winds between 22 and 27 knots; a Force 7 designation is ascribed to winds between 28 and 33 knots; a Force 8 designation is ascribed to winds between 34 and 40 knots; a Force 9 designation is ascribed to winds between 41 and 47 knots; a Force 10 designation is ascribed to winds between 48 and 55 knots; a Force 11 designation is ascribed to winds between 56 and 63 knots; and winds 64 knots or greater are Force 12 (essentially hurricane force).

stability and the righting lever at large angles of heel were low. Since a sailing ship's righting moment will vary with the set of the sails and the course steered, a master needs to know as much about his ship as possible, including any limitations in her stability. A vessel may appear comfortable and responsive up to quite large angles of heel, yet be deficient in her range of stability. Had stability information been available for the MARQUES, and had this information indicated that the vessel was in the low range of stability, a prudent officer in charge might have determined that she was carrying too much sail as the wind intensified in the early morning hours of June 3rd. Still, given the reported strength and suddenness of the squall, it is unlikely that the vessels' fate would have been different had she possessed sufficient stability information. The Wreck Commission so concluded and this writer concurs.

Thus, while in retrospect, if the Captain had been provided with the full range of stability data, it may have mandated that the vessel be sailed with a greater degree of caution, this has no impact on ASTA's potential liability. Certainly, it is clear that. the MARQUES was not patently unstable when viewed in port or under sail. Therefore, the Woodin & Marean data presented after the fact of loss, and any speculation as to what might have occurred had the master possessed that stability data, can have no impact on the Court's finding that, based on what it knew in the Spring of 1984, ASTA was reasonably justified in approving the MARQUES as a sail training vessel in reliance upon the Exemption Certificate granted by British authorities.

### 2. Qualifications of the Captain and Other Safety Concerns

ASTA required that the captain of any sail training vessel be properly certified, either by the United States Coast Guard or a similar body. The British Department of Transport issued an "Exemption" certificate on May 30, 1984 identifying those individuals authorized to act as master for the MARQUES. The certificate exempted the MARQUES from the certification requirements of the Merchant Shipping (Certification of Deck Officers) Regulations 1980(c) while authorized individuals were acting as master and mate. Stuart A. Finlay was authorized to act as captain and Dennis Ord was authorized to act as mate. The list of authorized masters and mates was valid until November 30, 1984.

Plaintiffs presented evidence that the copy of the United States Coast Guard license Finlay produced to Litchfield was at variance with the original held by the Coast Guard. The original license, issued in Boston on February 5, 1981, was restricted to vessels of not more than 60 gross tons and was limited to the "waters of the Atlantic Ocean, not more than 100 miles offshore between Great Boars Head, New Hampshire and Cuttyhunk Island, Massachusetts." The copy presented to Captain Jestico, Chief Examiner of Masters and Mates at the British Department of Transport, the official who approved Finlay, did not contain the geographic restrictions.

Captain Jestico testified before the Wreck Commission that he would not have authorized Finlay's inclusion on the approved list had he been aware of the geographic restrictions on Finlay's Coast Guard license. However, it is likely that Finlay would have ultimately been approved because of the testimonials of other mariners about his extensive experience in sailing after a hearing on the subject. In any event, there was no evidence presented from which it could be concluded that ASTA had even a hint that there was some form of misrepresentation concerning Finlay's Coast Guard license or that Finlay was in any way unqualified to sail the MARQUES. To the contrary, Commodore Anderson was aware of Captain Finlay's strong reputation as a yachtsman. Anderson had been a captain or mate in more than six Bermuda races, as well as others in the Pacific and Atlantic Oceans, and had been Commodore of the New York Yacht Club and Chairman of the Americas Cup Races in Newport. He had known Finlay for about ten years, including the years during which Finlay was an officer in the U.S. Navy and when Finlay ran the sailing program at the United States Naval Academy for 4 years. Anderson also knew that Finlay had sailed as a navigator in some Bermuda races, had

served on board the INCA on the voyage from Plymouth, England to the Canary Islands, and had served on the MARQUES during the winter months in the Caribbean and ran a sail training school in Antigua. When Anderson learned in the Spring of 1984 that Finlay would be the master of the MARQUES for the upcoming sail races in 1984, he opined that Finlay was reliable and knowledgeable about sailing and, thus, would be a competent person to be in charge of the vessel.

■ Therefore, the ASTA Board of Directors was justified in relying on the Exemption certificate from the Department of Transport and the crew list supplied by Litchfield as well as Anderson's knowledge of Finlay when the MARQUES was accepted as a sail training vessel with Finlay in command.

#### a. The Graf Letters

Plaintiffs also attempted to discredit the management of the MARQUES by introducing into evidence two letters written by Philip Graf, an ASTA member from San Francisco who had sailed on the MARQUES under the command of Captain John Adams on a voyage from Plymouth, England to the Canary Islands at the end of 1983. Graf initially wrote Vice–Admiral Weschler of ASTA in February of 1984, stating that he could not recommend the MARQUES for sail training without substantial caveats after his experiences. Graf wrote Weschler again in March of 1984, repeating his misgivings concerning the lack of discipline and order, and the manner in which the ship was managed.

In response to Graf's letters, Vice–Admiral Weschler spoke with Litchfield's manager, Dutton, asking that he convey to Litchfield the message that organizational discipline must improve. The telephone call was followed by a telex to Dutton emphasizing that ASTA expected "disciplined, orderly, safe and clean ships and procedures." In response, Vice–Admiral Weschler was informed that Captain Martin Minter–Kemp was taking over command in Tenerife, Canary Islands. It was reasonable for Weschler to have been reassured by this response, as Minter–Kemp was a person of high reputa-

tion in trans-Atlantic sailing and would be unlikely to run an undisciplined ship.

In addition to the communications to Litchfield, Graf's letters prompted ASTA to insert two clauses in the written agreement with China Clipper. First, a clause was inserted whereby China Clipper agreed "to provide disciplined, orderly, clean and safe ships for the ASTA cruises." Secondly, the agreement allowed ASTA to place two counsellors aboard each vessel during the Bermuda-to-Halifax race to assist with the orderly running of the vessels.

The evidence thus establishes that the concerns Graf articulated were remedied prior to the Bermuda-to-Halifax race. It is important to note that Graf's concerns related to the *management* and not the *seaworthiness* of the vessel. Whatever faults there might have been with the management of the vessel previously, Minter–Kemp, a well-respected captain, took over command in Tenerife for the trans-Atlantic voyage and Finlay took over for the races. Graf's letters certainly bear no relation to the management of the vessel under Captain Finlay's command. In fact, Graf himself testified that he had a great deal of respect for Captain Finlay and that Finlay had numerous ideas for changes that could be made to improve the situation aboard the MARQUES.

In addition, the Court notes that Donald L. Treworgy, an instructor in navigation at the Mystic (Conn.) Seaport Museum who served as the education officer aboard the MARQUES for the San Juan-to-Bermuda leg of the race, did not voice any concerns for the safety or management of the MARQUES under Finlay's stewardship. In fact, Treworgy, an expert in celestial navigation and astronomy, testified that he considered Finlay to be an observant and careful navigator. He testified that Finlay was an excellent manager and an aware captain who was supportive of his crew.

Furthermore, Captain Crowninshield testified that when he met Treworgy in Bermuda, Treworgy reported that they had had a good trip. (It is to be noted that the MARQUES won the San Juan-to-Bermuda leg of the race based on adjusted times with the same regu-

lar crew and six Antiguan sail trainees.) According to Crowninshield, Treworgy did not criticize Finlay, the officers or the crew, nor did he express any concerns about the seaworthiness of the vessel. Crowninshield did recall that Treworgy commented upon the fact that the main hatch was rather large being a converted cargo hatch and that the hatch was left open at night when the weather was good to assist in ventilation of the living quarters. However, it is perfectly reasonable that Crowninshield would have assumed that the hatches would be secured in unfavorable weather. Crowninshield recalled Treworgy remarking that the charts aboard the MARQUES were rather old and that the single side ban radio, which was able to receive but unable to transmit, was being worked on in Bermuda. Crowninshield further testified that on the evening of June 1st he asked Litchfield for a report on the progress of the repairs and was assured in response that all safety matters would be taken care of prior to the start of the race. The Court finds that it was reasonable for Crowninshield to have believed that repairs would be completed prior to the start of the Bermuda-to-Halifax leg.

b. The Unsecured Hatches

Plaintiffs also argue that ASTA should be held liable because the hatches on the MARQUES were not properly secured against the seas, thereby allowing water to enter through the open hatches when she capsized. Since the main hatch was a converted cargo hatch, it was larger than a hatch would normally be on a square rigger. The hatches depended for their watertightness on their being properly secured. Hatch boards and tarpaulins were supplied and they were supposed to be secured with ropes, metal battens and wooden wedges properly hammered home. However, there was evidence that because of discomfort of the crew in the quarters below due to lack of ventilation, the hatches were often left uncovered. On the night the MARQUES sank, the hatches were covered with tarpaulins to exclude the rain, but they were not covered with the wooden hatch covers.

■ Once the MARQUES had capsized and its sails and rigging were in the water, it could not right itself and, consequently, sank within one or two minutes. It is unknown whether the vessel could have righted itself if all the hatches had been closed and secured. It may be that the unsecured main midship hatch, or the fact that the openings in the bulwarks originally constructed as gun ports and later designated as freeing ports had been permanently sealed, contributed to the rapid sinking and, thus, the number of lives lost. Whether the hatches were secured or unsecured at the time of the capsize is, however, irrelevant to any claim against ASTA, since any negligence with respect to the condition of the hatches during the race is in no way attributable to ASTA.

Timothy O. Fanning, Jr., an ASTA representative on the Race Committee, conducted a safety and equipment inspection of the MARQUES on May 30th, just a few days before the race. This inspection included the life rafts, flares, V.H.F./S.S.B. radio and the pumps. The inspection disclosed lesser issues concerning the life rafts and other safety equipment, which were addressed and corrected prior to the start of the race. For example, the certificate of inspection for the inflatable life rafts was out of date, and telexed confirmation that servicing could be deferred was sought from the Marine Directorate in London. With respect to the hatch covers, it is entirely reasonable that Fanning would have assumed that any hatch covers that might have been open during the inspection in port would be closed prior to or during the race.

Once the race was underway, ASTA exercised no control over the operation of the MARQUES. All persons on board the MARQUES, including the ASTA counsellors, were subject to Captain Finlay's command. Thus, any negligence of the master in leaving hatches open, while possibly attributable to the owners of the vessel, can not be attributed to ASTA.

c. Failure to Require Life Preservers

■ Plaintiffs also argue that ASTA should be held liable for not requiring Thomas LeBel to wear a life preserver and a

safety harness while on deck.[15] Plaintiffs contend that such equipment should have been required given the conditions prevailing immediately prior to the capsize.

Plaintiffs' claim in this regard fails for the same reason as their claim concerning the hatches—it ignores the fact that the trainees were subject to Captain Finlay's command and not the command of the ASTA counsellors. The responsibility for determining the need for safety equipment and then effecting appropriate orders rested with the captain, not with ASTA.

In addition, there was evidence that ASTA counsellor Susan Howell, who perished when the vessel sank, warned the trainees to wear life jackets while on deck. Stuart P. Gillespie, Jr., a 50–year–old professor of music who also served as an ASTA counsellor aboard the MARQUES, testified that at midnight on the 3rd Howell requested that all trainees wear life jackets when on deck. There was further evidence that Howell, who was the Chairperson of ASTA's Sail Training and Education Committee, provided Thomas LeBel with a life jacket and told him he should wear it. Gillespie testified that he had a brief conversation with LeBel just prior to the sinking and he remembered observing LeBel with a life jacket. While Clifton H. McMillan, a 16–year–old sail trainee from Texas, testified that he did not recall any instructions to wear life jackets and that he did not think that LeBel had a life jacket on immediately preceding the capsize, in light of Gillespie's testimony, McMillan's testimony only underscores the fact that the ASTA counsellors lacked the authority to require the trainees to do anything.

Therefore, ASTA did all that it was reasonably required to assure the safety of the sail trainees. ASTA placed no trainees aboard the MARQUES until the ship had been issued a Load Line Exemption Certificate by the British Department of Transport and its captain, Stuart Finlay, had been approved by the Department to serve as captain. In addition, ASTA solicited a report from ASTA counsellor Treworgy who had just completed a voyage aboard the MAR-QUES. Furthermore, ASTA member Fanning visited the MARQUES to inspect the safety equipment which by the Rules the ship was obligated to carry. Finally, ASTA placed two counsellors aboard the vessel to assist in the communication between the sail trainees and Captain Finlay. The ASTA counsellors acted prudently to reduce the risks to which the sail trainees were exposed.

### 3. The Decision to Start the Race

The final issue of negligence raised by plaintiffs is whether ASTA was negligent in participating in the decision to start the race on June 2, 1984 in Bermuda. Plaintiffs essentially allege that ASTA knew or should have known that the weather posed unreasonable risks for the sail trainees.

First, it should be noted that the race was conducted pursuant to the "Racing and Sailing Rules" of STA and ASTA. These Rules were given to the captains and owners of each vessel entered in the race. Under the subheading "Seaworthiness, Safety Precautions and Equipment Regulations" is Rule 70.(1), entitled "Seaworthiness," which states that "[T]he safety of a vessel and her crew is the sole and inescapable responsibility of the Master . . . ." The ASTA "Vessel Inspection Report" completed by Fanning indicates that this rule was brought to Captain Finlay's attention during Fanning's inspection. Thus, the ultimate responsibility for determining whether to start the race rested with Captain Finlay, given his knowledge of the vessel, his crew, his own capabilities and the available weather information.

■ With respect to ASTA's consideration of the weather, the Court finds that ASTA was not negligent in its decision to allow the race to start as planned.

#### a. Available Weather Information

A Captain's Briefing was held at 9:00 a.m. on Friday the 1st of June, the morning before the scheduled start of the race. The meeting was attended by the master and an officer from each ship. STA personnel had arranged for a meteorological officer from

---

15. Since James McAleer was wearing a safety harness and a life preserver when the MARQUES was knocked over, plaintiffs argument concerns only Thomas LeBel.

the United States Naval Air Station in Bermuda to address the group. The weather briefing included 24–, 48–, and 72–hour forecasts. The forecast was for a slow-moving front (5 to 10 knots) to pass through the Bermuda area by the early morning of Sunday, June 3rd, with associated south westerly winds of Force 4 to Force 6. After passage of the front, it was predicted that the wind would veer to the northwest and reduce slightly.

A weather synopsis and three synoptic charts issued by the Air Station were distributed to each master. The charts were for 8:00 a.m. on the 1st, 2nd and 3rd of June. These charts illustrated a low off Cape Cod moving northeast and an expanding area of high pressure over Florida. The first synoptic chart showed the Gulf Stream well north of Bermuda. While the charts for June 2nd and 3rd showed a curved dotted line well north of Bermuda which may have indicated a secondary trough, none of those who attended the meeting could recall any reference to the line nor any attention drawn to this area of the charts. Nothing was said by the weather expert at the meeting which gave any cause for concern once the front had passed across Bermuda.

Given that the principal concern at the meeting was the cold front which had still to pass, it is not surprising that the dotted line was ignored. Wind arrows on both charts near the dotted line indicated no wind greater than 25 knots (Force 5), giving no warning of severe weather associated with the dotted line. Additionally, the high seas forecast composed by the United States Weather Bureau for the same time did not warn of the trough, nor did it give warning of the area of disturbance to its west.[16] Finally, the weather synopsis handed out with the charts shed no light on the dotted curve, since the synopsis concerned only the area around Bermuda, and the tail of the dotted curve was about 300 miles to the northwest of Bermuda.[17]

As it turned out, the front that passed through on the evening of June 1st was earlier and stronger than expected, with heavy rain and a westerly wind of 25 to 35 knots. During the worst of the weather overnight, there was some discussion amongst Race Committee members as to whether to postpone the start.

On the morning of June 2nd, John Hamilton, the official acting as race director for the STA, telephoned the Bermuda Radio Station, which receives weather information from the United States Naval Air Station, for the latest local area forecast. The forecast confirmed improving conditions with high pressure beginning to move over Bermuda as the cold front moved away to the east. According to Hamilton, there was no mention of winds or gusts of Force 8. At 9:00 a.m. on the 2nd, there was a high seas gale warning forecasting strong winds of 35 to 45 knots in an area immediately east of Bermuda but moving northeast at 20 knots. Since the actual wind was about Force 5, however, and the stronger wind was moving rapidly to the northeast, the forecast did not constitute a threat to the race. The wind would be westerly at 15 to 20 knots, diminishing to 10 to 15 knots with gusts of 20 knots and isolated

16. Since high seas forecasts are directed towards merchant ships which are not greatly affected by localized phenomena, these forecasts report only the principal weather features of the particular area and weather directly associated with those features. Thus, high seas forecasts cover thousands of square miles of ocean and are not sufficiently detailed to forecast a secondary trough or an area of disturbance in its wake, or individual squalls not associated with a principal meteorological feature. While high seas forecasts provide greater detail for areas adjoining the eastern seaboard of the United States, the MARQUES was lost in an area east of the areas of detail.

17. The synopsis read as follows:
Synoptic Situation for Saturday and Sunday for Bermuda: Slow moving cold front west of Bermuda is moving east at 5 to 10 knots. Will pass through the area by early morning Sunday, with weak high pressure ridging into the area by Sunday afternoon. Possibly a small craft warning may be hoisted by Saturday morning, it will be broadcast over local radio stations.
Forecast for Saturday 2 June 1984: Cloudy with scattered rainshowers and possible isolated thunderstorms. Winds south to southwest 14 to 24 knots. Seas south 6 to 9 feet.... Outlook for Sunday 3 June 1984: Partly cloudy with scattered rainshowers, becoming mostly sunny by afternoon. Winds southwest 14 to 24 knots becoming northwest 10 to 20 knots by afternoon. Seas southwest to west 6 to 9 feet.

rain. An additional high seas forecast gave seas of 12 feet or greater for a wide area embracing Bermuda and the route of the race.

Given that the direction of the race was away from any potential area of danger, Hamilton recommended to the Race Committee that the race start. The Committee solicited further weather information while at sea awaiting the start aboard the H.M.C.S. MARGAREE. At this time, there was a westerly wind of Force 4 to 5, and an awkward, confused swell, which was attributed to the cold front that had passed. The weather was fine with scattered clouds. All members of the Race Committee agreed that there was no reason to postpone the start.

No negligence can be attributed to ASTA for its approval of the start of the race. The decision to start the race was made only after consulting the latest weather forecasts. Reliance on the opinion of the meteorological expert from the United States Naval Station given at the Captain's Briefing was justified. Certainly, it was not through any fault on the part of ASTA that the dotted lines on the synoptic charts were not discussed at the briefing. The information supplied at the Captain's Briefing indicated that there would be no problem from winds or high seas. Although winds as great as Force 7 might be expected at some time during the race, this was no cause for concern. Any awkwardness or lumpiness in the sea, while likely to cause seasickness, was not cause to delay the start of the race.

In sum, the Court finds that ASTA exercised due and reasonable care in every respect. No acts or omissions of ASTA subjected the MARQUES or its crew to an unreasonable risk of harm.

### C. Proximate Cause of the Sinking

In any event, this Court is satisfied that no act or failure to act on the part of ASTA can be determined to be the proximate cause of the loss of the MARQUES. The proximate cause of the sinking was clearly the unforecasted hurricane force winds that struck the ship broadside. *See, e.g., Cobb v. United States,* 1979 A.M.C. 1362, 1383 (M.D.Fla.1979) (no judgment may be entered where the proximate cause of plaintiff's accident was a "sneaker wave", not reasonably foreseeable by the officers and crew of the vessel).

Nature itself played a leading role in the MARQUES' dramatic demise. As mariners have found for centuries, the sea contains many perils. This particular accident occurred adjacent to the "Bermuda Triangle," an area of the Atlantic infamous for inclement weather.[18] As happens all too often in this area, the MARQUES was the victim of a sudden, unforecast and unforeseen deterioration of the weather. A line squall with a microburst superimposed on 25- to 30-knot prevailing winds struck the MARQUES without warning and put her on her side. As the Wreck Commission Report concluded at page 45 (emphasis in original); "[I]t was the coincidence of direction of the downdraught [microburst] with the prevailing wind that made the squall that sank the MARQUES so violent. Though this coincidence is rare it is a *known phenomenon ...."* Any chance of detecting the line squall was lost due to the overcast night, when the normally telltale cumulonimbus cloud was hidden from view. Furthermore, neither the barometer nor the forecasts gave any indication of the worsening weather. In fact, the forecasts indicated that the weather would improve as the low moved to the northeast and the cold front continued to proceed eastwards.

#### 1. Testimony of Survivors

The testimony of the survivors—in person, through deposition, as well as before the Wreck Commission—leaves no doubt that a sudden and ferocious wind hit the MARQUES. All those aboard the MARQUES described a violent wind. Cliff McMillan, who was below deck at the time, testified that he heard a "howling" noise immediately prior to the knock-down. ASTA trainee William S. Barnhardt, a 24-year-old building contractor who was on deck when the MARQUES was knocked down, testified at deposi-

---

18. It should be noted, however, that the race organizers had chosen a favorable time of year in which to hold the race. It was not the hurricane season and winds of hurricane force are comparatively rare during the month of June.

tion that the wind was extremely powerful. Explaining that he had previously witnessed 50 m.p.h. tornado winds destroy a barn in the midwest, Barnhardt estimated the wind speed to be between 85 and 90 m.p.h. (Force 11 to Force 12). ASTA counsellor Gillespie, below deck at the time, likened the sound of the squall hitting to that of an aircraft passing close overhead. John Ash, the geologist from New Hope, Pennsylvania, also compared the sound to that of a jet engine, testifying at deposition that it was the "fiercest" wind he had ever experienced. Climbing on deck immediately after the capsize, Ash observed water blowing in a horizontal direction and estimated that the wind was blowing in excess of 70 or 80 knots. According to the Beaufort Scale, such a wind would be classified as a Force 12 wind, a hurricane force wind. Consistent with Ash's observations, a Force 12 wind causes the air to become filled with sea and foam, and the sea white with driving spray.

Testifying before the Wreck Commission, Dennis Ord, the first mate of the MARQUES and an experienced sailor, described a "tremendous wind" which he estimated to be in the region of Force 11. Also testifying before the Wreck Commission, Phil Sefton, who was located on the poop deck at the time of the incident, estimated the wind to be far stronger than a 55–knot gust he had measured on the voyage to Tenerife, Canary Islands. Sefton described the sea as "milky white ... it was blowing off spray so fast," a description also consistent with Force 11 or 12 winds.

Plaintiffs presented Dr. Frederick Sanders, a retired professor from the Massachusetts Institute of Technology, as an expert meteorologist. He theorized, based on the weather forecasts for the area and observations made from other ships, that the winds where the MARQUES was lost were 25 to 30 knots gusting to not much in excess of 40 knots and that there was *no* microburst or waterspout (a tornado on water) which caused the capsizing of the vessel. This testimony was of little value to the Court, in view of the credible and consistent evidence secured from all the survivors. The Court has no difficulty in concluding that the MAR-QUES was hit broadside by a microburst of wind (a localized hurricane) superimposed on a line squall which produced winds of such force that the vessel was blown down on her starboard side with her masts and sails in the water. Water then poured into the deck hatches and she sank within one or two minutes.

2. Experiences of Other Vessels

In addition to the testimony of the survivors concerning the weather, the experiences of the other vessels in the vicinity were probative evidence of the conditions that existed on the night the MARQUES sank. There was extensive evidence that other vessels experienced sudden, unforecast squalls of considerable magnitude that night. The MARQUES, down wind of many of the competitors, was hardly the first vessel to encounter bad weather or to be struck by a violent squall.

At about 10:16 p.m. on June 2nd, about six hours before the MARQUES encountered difficulty, the United States Coast Guard barque EAGLE was surprised by a squall with high winds, estimated by the commanding officer to be 70–plus knots (Force 12). There was evidence that the Eagle suffered a "knock down" and was heavily damaged. Following the incident, the EAGLE's commanding officer reported to the Coast Guard in Washington that the weather messages did not predict squalls of the intensity encountered or the gale force winds associated with them. This was an early incident indicating that the weather conditions were in marked variance with the forecasts.

At 2:30 a.m. on the 3rd, the MAJORITY OF ONE was located about 200 miles to the west of where the MARQUES sank when a menacing cloud with an approximately ¼–mile–wide shaft extending into the sea was seen and identified as a waterspout.

Closer to the time of the sinking, at 4:30 a.m. on June 3rd, the SMUGA CIENA was several miles northeast of where the MARQUES sank when she experienced weather similar to that experienced by the MARQUES. The west-south-westerly wind had increased to about Force 8, when without warning there was a severe squall from the same direction of Force 10 to 11. The squall,

which lasted 3 to 4 minutes, caused the yacht to heel over, putting her boom in the sea.

The DONALD SEARLE, which was about 50 miles to the northwest of where the MARQUES sank, also encountered severe squalls. At about 4:00 a.m. on June 3rd, the wind increased to 50 knots or greater (Force 10 to 11), lasting for about ten minutes.

The OUR SVANEN was about 10 miles north northeast of the MARQUES. Vice–Admiral Weschler who was aboard recalled that the wind had steadily strengthened during the night, reaching its peak of Force 7 between 4:00 and 4:30 a.m. with gusts of Force 8 and periodic rain showers.

The NOVIK, only 12 miles to the west southwest of the MARQUES, logged a north westerly gale of Force 8 at 4:00 a.m.

The FLORA was about 24 miles to the west of the MARQUES and logged Force 11 winds at 4:00 a.m. with westerly seas of 8.5 meters plus.

The AZTEC LADY was about 20 miles to the southwest and recorded gusts up to 55 knots (the upper limit of Force 10) during the middle watch.

Finally, the guard ship H.M.C.S. ASSINIBOINE, a Royal Naval Canadian Destroyer, found the night to be worse than forecast, with a near gale and gusts to 35 knots, along with rough seas and very heavy squalls.

The general pattern what emerges from these observations is an area of gale force winds disturbed by scattered sea squalls. As the Wreck Commission Report concluded at page 42: "The confused and unpleasant seas, reported widely, were probably due to the presence of a number of localised [sic] storms in addition to the earlier passage of the front. The experience of the SMUGA CIENA and the MARQUES and to a lesser extent the OUR SVANEN may be evidence of a line squall which can extend over 10 to 25 miles. The FLORA 20 miles to the West and the DONALD SEARLE 50 miles to the North West demonstrate the scattered nature of the squalls experienced at about the same time."

Given the overwhelming testimony of the survivors and the corroborating experiences of other vessels in the area, the Court concludes, as did the Wreck Commission, that the strength of the squall that struck the MARQUES was a Force 11 or 12. In light of the destructive force of such a wind, the proximate cause of the sinking of the MARQUES was clearly an unfortunate and unpredictable encounter with hurricane force winds. This can be classified as an Act of God or a natural disaster. One thing is clear, ASTA is totally without fault in this tragedy.

## D. Negligent Misrepresentation

■ Plaintiffs' have also asserted a negligent misrepresentation claim. However, plaintiffs' negligent misrepresentation theory is not supported by the evidence. While the LeBels, and undoubtedly McAleer, may have relied on certain information that was given to them, that information came from China Clipper.

There was no evidence that ASTA made representations concerning the MARQUES beyond perhaps the specifications for the MARQUES or the information contained in the Sail Training Cruise Registration Form. Crowninshield testified that ASTA provided no other documents containing detailed information about the MARQUES, and that the specifications of the MARQUES were not even mailed by ASTA.

The Sail Training Cruise Registration Form stated that "INCA and MARQUES are owned and operated by the China Clipper Society of Kent, England. The Form further stated that: "[T]hose in charge of the ship and the overall program are encouraging safe participation and operations. U.S. vessels are Coast Guard certified for safety with licensed captains. Foreign flag vessels have compatable [sic] qualifications." Plaintiffs assert these statements as the basis for their negligent misrepresentation claim. However, this Court has already concluded that ASTA exercised reasonable care to assure that the sail trainees were aboard a safe and well-manned vessel. Furthermore, there was no evidence that any of these representations were inaccurate.

### E. Agency and Joint Venture Theories

 Plaintiffs have also asserted an agency and a joint venture theory of liability against ASTA. However, ASTA was neither the agent of the owners nor in a joint venture with the owners of the vessel. ASTA's function was to match the ships with the sail trainees, provide instruction to the sail trainees and assist in organizing the race. None of these activities makes ASTA the agent of the owners of the MARQUES in any way.

"Agency" has been defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." Restatement (Second) *Agency* § 1(1) (1958). "Thus, the three elements required to show the existence of an agency relationship include (1) a manifestation by the principal that the agent will act for him, (2) acceptance by the agent of the undertaking, and (3) an agreement between the parties that the principal will be in control of the undertaking. It is essential to the relationship that the principal have the right to control the work of the agent, and that the agent act primarily for the benefit of the principal." *Lawrence v. Anheuser–Busch, Inc.*, 523 A.2d 864, 867 (R.I.1987) (citations omitted).

Plaintiffs offered no evidence which would indicate that China Clipper in any way retained the right to control the work of ASTA. In fact, it was ASTA which exercised greater control over the organization of the race. Thus, the facts do not indicate that the relationship between China Clipper and ASTA was that of a principal and agent.

 Nor can it be said that ASTA and the owners of the MARQUES were engaged in a joint venture. Under Rhode Island law, a joint venture is an association of two or more persons formed to carry out a single business enterprise for profit. *Fireman's Fund Ins. Co. v. E.W. Burman, Inc.*, 120 R.I. 841, 844, 391 A.2d 99, 101 (1978). Generally, in order for a joint venture to exist, the parties must be bound by express or implied contract providing for: (1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking. In addition, the joint venture agreement must provide for a sharing of losses as well as profits. *Ross v. Trans Nat'l Travel*, 1990 WL 79229 (D.Mass.); 48A C.J.S. *Joint Ventures* §§ 11–13 (1981).

The evidence in this case does not provide the basis for finding such an arrangement. The relationship that existed between ASTA and the owners of the MARQUES was decidedly different than that required in a joint venture arrangement. While ASTA and China Clipper may have engaged in coordinated promotional activities for their mutual advantage, the record contains no evidence of any agreement to share profits and losses. In fact, ASTA was a non-profit organization. In addition, there is no evidence that ASTA had anything near an equal right to direct the operations of the MARQUES. Thus, the record clearly does not support a joint venture theory.

### III. Conclusion

For the reasons stated above, the Court concludes that defendant American Sail Training Association is not liable to plaintiffs under DOHSA or general maritime law. No judgment will enter now. The Court will schedule a hearing after notice to all parties, at which time the Court will determine the amount of the default judgments to be entered for plaintiffs against defendants Litchfield and Cecil–Wright and also order the entry of all other appropriate judgments in the case at that time.

It is so ordered.