USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-2198 EDWARD J. MCALEER, ADMINISTRATOR OF THE ESTATE OF JAMES F. MCALEER, AND HARDY LEBEL AND JOAN LEBEL, ADMINISTRATORS OF THE ESTATE OF THOMAS A. LEBEL, Plaintiffs, Appellants, v. TRAVER C. SMITH, ADMINISTRATOR OF THE ESTATE OF STUART A. FINLAY, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ ____________________ Before Cyr, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Edward M. Pitts with whom Pitts & Pitts was on brief for _________________ _______________ appellants. Holly S. Harvey with whom Thornton, Davis & Murray, P.A., was on _______________ _______________________________ brief for appellee. ____________________ June 19, 1995 ____________________ STAHL, Circuit Judge. Plaintiffs-appellants appeal STAHL, Circuit Judge. _____________ from the district court's grant of summary judgment to defendant-appellee in this admiralty case. We affirm. I. I. __ BACKGROUND BACKGROUND __________ On June 3, 1984, the Tall Ship S/V MARQUES, a participant in the Cutty Sark International Tall Ships Race between Bermuda and Nova Scotia, encountered a violent squall about eighty miles northeast of Bermuda. Almost without warning, and within seconds of starting to take on water, the vessel sank with the loss of nineteen of the twenty-eight persons on board, including the plaintiffs' decedents and the defendant's decedent, the vessel's master or captain, Stuart A. Finlay. Plaintiffs' decedents, James F. McAleer and Thomas A. Lebel, were on board under the auspices of a sailing program run by the American Sail Training Association ("ASTA"), which had arranged for six sail trainees to crew for the MARQUES during the race. Plaintiffs brought claims against defendant for unseaworthiness under the general maritime law; for negligence under the Jones Act, 46 U.S.C. 688; for negligence under the general maritime law; and for wrongful death under the Death on the High Seas Act, 46 U.S.C. 761- 768 ("DOHSA"). The district court granted summary judgment to defendant, holding that defendant could not be liable for -2- 2 unseaworthiness because Finlay was not an owner of the MARQUES, McAleer v. Smith, 818 F. Supp. 486, 494 (D.R.I. _______ _____ 1993); for negligence under the Jones Act, because Finlay did not employ plaintiffs' decedents, id. at 493-94; for ___ negligence under the general maritime law, because such claims cannot be brought by seamen against masters, id. at ___ 496; or under DOHSA, because DOHSA is a derivative cause of action requiring the existence of another claim not existent here, id. at 496-97. From that judgment this appeal ___ followed.1 II. II. ___ DISCUSSION DISCUSSION __________ A. Standard of Review ______________________ As always, we review a district court's grant of summary judgment de novo and, like the district court, review __ ____ the facts in the light most favorable to the nonmoving party. See, e.g., Lareau v. Page, 39 F.3d 384, 387 (1st Cir. 1994). ___ ____ ______ ____ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there  ____________________ 1. The district court granted defendant's motion for summary judgment on April 8, 1993. The district court nonetheless held a trial to determine damages because it had entered default judgments against the co-owners of the MARQUES, see ___ McAleer v. Smith, 860 F. Supp. 924, 930 n.10 (D.R.I. 1994). _______ _____ On October 18, 1994, the district court entered judgments of $403,246.57 for Lebel and $322,597.25 for McAleer against the co-owners, and entered final judgments in favor of defendant in the instant appeal and other defendants. -3- 3 is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). B. Unseaworthiness ___________________ Shipowners are liable to indemnify seamen2 for injuries "caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment." Seas Shipping Co. v. _________________ Sieracki, 328 U.S. 85, 90 (1946) (citing The Osceola, 189 ________ ____________ U.S. 158 (1903)). Unseaworthiness "is essentially a species of liability without fault . . . . It is a form of absolute duty." Id. at 94-95; see also Grant Gilmore & Charles L. ___ ___ ____ Black, Jr., The Law of Admiralty 6-41, at 393 (2d ed. ______________________ 1975). Shipowners may not delegate their duty to provide a seaworthy ship. Sieracki, 328 U.S. at 94 n.11. ________ Plaintiffs concede that Finlay did not own the MARQUES, which was co-owned by Mark Shirley Portal Litchfield and Robin Patrick Cecil-Wright, the sole principals in the China Clipper Company, an unincorporated holding company that held title to the MARQUES. Plaintiffs argue, however, that Finlay is nonetheless liable for unseaworthiness because he was an owner pro hac vice. ___ ___ ____  ____________________ 2. For the purposes of this summary judgment motion, we assume arguendo, as Judge Selya did for other MARQUES sail ________ trainees in Heath v. American Sail Training Ass'n, 644 F. _____ _____________________________ Supp. 1459, 1468 (D.R.I. 1986) (Selya, J.), that plaintiffs' decedents were seamen despite the fact that they were unpaid (indeed, themselves paying for the privilege of being on board as trainees).  -4- 4 An "owner pro hac vice" of a vessel is "one who ___ ___ ____ `stands in the place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel.'" Matute v. Lloyd Berm. Lines, Ltd., 931 F.2d 231, 235 n.2 (3d ______ ________________________ Cir.) (quoting Aird v. Weyerhaeuser S.S. Co., 169 F.2d 606, ____ ______________________ 610 (3d Cir. 1948), cert. denied, 337 U.S. 959 (1949)), cert. _____ ______ _____ denied, 502 U.S. 919 (1991). In effect, for liability ______ purposes, an owner pro hac vice is treated as a shipowner. ___ ___ ____ See Reed v. The Yaka, 373 U.S. 410, 412-13 (1963); see ___ ____ _________ ___ generally Gilmore & Black, The Law of Admiralty 4-23, at _________ _____________________ 242. Thus, an owner pro hac vice may be liable for the ___ ___ ____ unseaworthiness of a vessel. See Reed, 373 U.S. at 412-13. ___ ____ In general, if there is an owner pro hac vice, the title ___ ___ ____ owner will be absolved of personal liability (except for defective conditions that existed before the owner pro hac ___ ___ vice took control of the vessel). See Ramos v. Beauregard, ____ ___ _____ ___________ Inc., 423 F.2d 916, 917-18 (1st Cir.), cert. denied, 400 U.S. ____ _____ ______ 865 (1970); see generally Thomas J. Schoenbaum, Admiralty and ___ _________ _____________ Maritime Law 5-3, at 168 (1987).  ____________ Admiralty cases have recognized only two types of owners pro hac vice: demise, or bareboat, charterers and ___ ___ ____ captains of fishing vessels operated under agreements, called "lays." A demise charterer is "one who contracts for the vessel itself and assumes exclusive possession, control, -5- 5 command and navigation thereof for a specified period," Stephenson v. Star-Kist Caribe, Inc., 598 F.2d 676, 679 (1st __________ ______________________ Cir. 1979), in contrast to a time or voyage charterer who "contracts not for the vessel itself but for a specific service of the vessel, such as carriage of goods, which is rendered by the owner's master and crew," id. Demise ___ charters are created when "the owner of the vessel . . . completely and exclusively relinquish[es] possession, command, and navigation thereof to the demisee. [They are] therefore tantamount to, though just short of, an outright transfer of ownership. However, anything short of such a complete transfer is a time or voyage charter party or not a charter party at all." Guzman v. Pichirilo, 369 U.S. 698, ______ _________ 699-700 (1962) (internal quotation and citations omitted); see generally Gilmore & Black, The Law of Admiralty 4-21, ___ _________ ____________________ at 240. While demise charterers may be liable for unseaworthiness as owners pro hac vice, see Reed, 373 U.S. at ___ ___ ____ ___ ____ 412-13, time or voyage charterers may not be, see Stephenson, ___ __________ 598 F.2d at 679; see also Rodriguez v. McAllister Bros., ___ ____ _________ _________________ Inc., 736 F.2d 813, 815 (1st Cir. 1984). The mere fact that ____ a time or voyage charterer "`has some control over the master . . . [or] selects the routes to be taken or the cargo to be carried does not make him the owner pro hac vice.'" ___ ___ ____ Stephenson, 598 F.2d at 681 (quoting Fitzgerald v. A.L. __________ __________ ____ -6- 6 Burbank & Co., 451 F.2d 670, 676 (2d Cir. 1971)) (alterations _____________ in Stephenson).  __________ Captains of vessels operated under fishing lays, which are agreements under which the participating fishermen share the catch, may also be liable as owners pro hac vice. ___ ___ ____ See Cromwell v. Slaney, 65 F.2d 940, 941 (1st Cir. 1933). ___ ________ ______ Such situations are similar to demise charters, for a fishing-lay captain will only be found to be an owner pro hac ___ ___ vice if "the captain employs the members of the crew and ____ controls all the operations of the vessel, both in purchasing supplies for the voyage, in determining where he will fish, how long, and in disposing of the catch and settling all the bills." Id. ___ Plaintiffs cite no case, and we have found none, outside the context of a fishing lay that accords a master status as an owner pro hac vice. In fact, many of our cases ___ ___ ____ find an owner liable precisely because the owner (rather _______ than, say, the time charterer) provided the master and crew. See Stephenson, 598 F.2d at 680. As a general rule, we think ___ __________ that masters are not owners pro hac vice because a master, ___ ___ ____ despite having control over the vessel, exercises that control on behalf of the owner. Cf. 46 U.S.C. 10101(1) ___ (defining "master" as "the individual having command of a vessel"); 46 U.S.C. 10101(2) (defining "owner" as "the person to whom the vessel belongs"). -7- 7 Plaintiffs argue, however, that even if masters are not generally considered to be owners pro hac vice, Captain ___ ___ ____ Finlay had responsibilities for and interests in the MARQUES beyond those of an ordinary master that render him liable as an owner pro hac vice. In particular, plaintiffs point out ___ ___ ____ that Finlay had full operational control of the MARQUES, except that he had to report itinerary changes to the owners; that Finlay drew the ship's regulations for both mates and crew members, and that everyone on board was required to "read" his orders; that Finlay's contract with the MARQUES's owners designated him as "self-employed"; that Finlay was engaged in promoting the business of the MARQUES, such as charters and cruises, for which he was paid a commission in addition to his monthly base pay;3 that Finlay was required to solicit contributions towards expenses and was obligated whenever possible to negotiate directly with suppliers to obtain free or discounted supplies in exchange for publicity or other recompense arrangements; that Finlay was a founding member and chief instructor of the Antiguan Maritime School and expected to use the MARQUES as a training ship to train young Antiguans in seamanship; and that the "Ship's Regulations" provided that one person, the captain, was  ____________________ 3. Although he received 1000 British pounds sterling per month while the MARQUES was at sea and 500 pounds per month while ashore, plaintiffs also argue that Finlay was not a salaried employee. -8- 8 solely responsible for the safety of the ship and those on board. Plaintiffs also point out that their decedents had no contact with the MARQUES's actual owners, but only with ASTA and Finlay, and make much of the fact that Finlay had the right to direct and control plaintiffs' decedents in the performance of their duties as sail trainees and the right to fire and/or remove them from the ship. We fail to see how these facts convert Finlay into an owner pro hac vice. In determining that Finlay was not an ___ ___ ____ owner pro hac vice, we are mindful not only of the law of ___ ___ ____ agency, but also of the fact that time charterers, who may exercise large amounts of control over the vessels they charter, are not subject to liability for unseaworthiness, see Stephenson, 598 F.2d at 679. While we take plaintiffs' ___ __________ arguments in turn, even considered cumulatively we do not think they support Finlay being considered an owner pro hac ___ ___ vice. ____ While Finlay did exercise operational control over the MARQUES, that control is inherent in being a master; it does not convert Finlay into an owner pro hac vice. ___ ___ ____ Similarly, drawing up the ship's regulations and giving orders are part and parcel of a master's duties; such activities do not accord Finlay status as an owner pro hac ___ ___ vice. That Finlay was designated as "self-employed" also ____ does not make him an owner pro hac vice. Despite being ___ ___ ____ -9- 9 "self-employed," Finlay still functioned as an agent of the owners; he did not assume control of the MARQUES in his own right and, accordingly, cannot be said to have stood in the place of the owner. We also do not think that the fact that Finlay was to receive a commission for business he brought to the MARQUES makes him an owner pro hac vice, any more than a ___ ___ ____ salesman paid a commission for his sales or a businessman paid a bonus for business brought in or money saved would become an owner of the business. Similarly, that Finlay was required to negotiate with suppliers does not make him an owner pro hac vice; rather, it was just one of the duties ___ ___ ____ imposed on him by the MARQUES's actual owners. There is no evidence that Finlay was to share in any savings generated by these negotiations. Indeed, the owners were responsible for all expenses associated with the MARQUES, including those incurred by captains for generating business or negotiating for supplies. Nor do we think that Finlay's role in the Antiguan Maritime School converts him into an owner pro hac vice. ___ ___ ____ While at some point in the future this may have brought some business to the MARQUES, thus being mutually beneficial for both Finlay and the owners of the MARQUES, there is no evidence that Finlay had actually brought such business to the MARQUES or that arrangements for such a venture had -10- 10 actually been made. Nor is there any evidence to suggest that Finlay had entered into any sort of partnership with the owners of the MARQUES regarding the school; the implication, therefore, is that Finlay would have received his standard commission for bringing business to the MARQUES if in fact he ever brought such business from the school. The fact that the Ship's Regulations provided that the captain was solely responsible for the safety of the ship and those on board does not make Finlay liable for the ship's unseaworthiness, because a shipowner's duty to provide a seaworthy ship is nondelegable. See Sieracki, 328 U.S. at 94 ___ ________ n.11. Holding Finlay to be an owner pro hac vice because the ___ ___ ____ Ship's Regulations made him solely responsible for the safety of the ship would defeat the rule of nondelegability, for it would absolve the owners of liability for unseaworthiness. See Ramos, 423 F.2d at 917-18 (holding that owner could not ___ _____ be "liable for unseaworthy conditions arising after he has parted with control over his vessel under a demise charter" and that "a shipowner cannot escape liability by delegating partial control of his vessel to an independent contractor"). That plaintiffs' decedents had no contact with the MARQUES's owners, but only with ASTA and Finlay, does not convert Finlay into an owner pro hac vice. Finlay played no ___ ___ ____ part in hiring plaintiffs' decedents or in arranging with ASTA to have paying sail trainees on board. Finlay was not -11- 11 to share in the profits from the owners' arrangement with ASTA, nor in any profits from the vessel's participation in the tall ships race. That Finlay had authority over plaintiffs' decedents is not indicative of status as an owner pro hac vice, for any master would necessarily have such ___ ___ ____ authority over his crew. To the extent that plaintiffs argue that Finlay was a partner or co-venturer with the MARQUES's owners, the undisputed facts make clear, as the district court noted, that Finlay had no ownership interest in the vessel, did not share in the profits from the vessel's operations, and had no control over the vessel's itinerary beyond the operational control necessarily assumed by a captain. The marketing and commission arrangement raises no inference of a partnership. Because plaintiffs have not produced facts that give rise to an inference that Finlay was either an owner pro ___ hac vice or a partner in the MARQUES, summary judgment was ___ ____ properly granted to defendant on plaintiffs' unseaworthiness claims. C. The Jones Act _________________ Congress passed the Jones Act in 1920 to abrogate the Supreme Court's holding in The Osceola, 189 U.S. 158, 175 ___________ (1903), that seamen could not recover under the general maritime law for the negligence of the master or crew. See ___ generally Gilmore & Black, The Law of Admiralty 6-20, at _________ _____________________ -12- 12 325-28. The Jones Act4 provides a remedy to a "seaman" injured (or killed) "in the course of his employment." 46 U.S.C. 688. The Jones Act remedy is available only against the seaman's employer. Cosmopolitan Shipping Co. v. ____________________________ McAllister, 337 U.S. 783, 787 n.6 (1949). Accordingly, __________ plaintiffs can recover against defendant under the Jones Act only if Finlay was plaintiffs' decedents' employer. Plaintiffs contend that if their decedents "were employees of anyone," they were employees of Captain Finlay. We do not agree. Although Finlay exercised authority over plaintiffs' decedents, he did so only as an agent of the  ____________________ 4. The Jones Act provides: Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located. 46 U.S.C. 688. -13- 13 owners, and not on his own behalf. Cf. Matute, 931 F.2d at ___ ______ 236 (Holding that a time charterer was not a seaman's employer when "[t]he owner . . . , through the ship's ___________________ captain, hired Matute [the seaman] and eventually terminated _______ him. It set the amount of Matute's wages and was responsible for paying him. The captain supervised Matute in his position as oiler.") (emphasis added). Finlay had nothing to do with arranging with ASTA for the sail trainees to be on board the MARQUES; accordingly, he cannot be said to have "hired" them in any sense. Nor was Finlay to receive any benefit from having the sail trainees on board; rather, monies paid by the sail trainees went to the owners of the MARQUES, with a small amount reserved by ASTA to cover its expenses.  In arguing that Finlay should be held to be plaintiffs' decedents' employer, plaintiffs rely on many of the same reasons they relied on in arguing that Finlay was an owner pro hac vice. We need not re-analyze those reasons ___ ___ ____ here because they do not indicate that Finlay was an employer any more than they indicate that he was an owner pro hac ___ ___ vice. Accordingly, the district court properly granted ____ summary judgment to defendant on plaintiffs' Jones Act claims.  D. Negligence Under General Maritime Law _________________________________________ -14- 14 Plaintiffs argue that they are entitled to recover from defendant for negligence under the general maritime law on two separate theories. First, plaintiffs argue that they have such a cause of action if their decedents, as sail trainees who each paid $750 to crew on the MARQUES, are found to be passengers rather than seamen. Second, plaintiffs argue that if their decedents were seamen, they nevertheless may maintain a cause of action for negligence against the master under the general maritime law. We consider these arguments in turn. -15- 15 1. Recovery as Passengers __________________________ Plaintiffs now urge that because their decedents paid to crew on the MARQUES, they may be considered passengers rather than seamen and so have a cause of action against the master for negligence under the general maritime law. Defendant argues, however, that plaintiffs never made this argument to the district court, and that in fact plaintiffs fought hard to establish that their decedents were seamen, as recovery for unseaworthiness and under the Jones Act is limited to seamen. When asked at oral argument whether plaintiffs had raised this argument in the district court, plaintiffs' counsel referred the court to a portion of plaintiffs' memorandum of law opposing defendant's motion for summary judgment. In turning to plaintiffs' memorandum, the most applicable statement we could find reads, "A general maritime claim for negligence exists no matter what the status of Finlay was, even if he were found not to be an owner pro hac ___ ___ vice." We do not view this statement as preserving a claim ____ stemming from plaintiffs' decedents' possible status as passengers. In fact, in another portion of their memorandum, plaintiffs cited Judge Selya's opinion in Heath v. American _____ ________ Sail Training Ass'n, 644 F. Supp. 1459, 1463 (D.R.I. 1986) ____________________ (Selya, J.) (dealing with claims by other sail trainees killed in same accident), for the proposition: "It is -16- 16 established that the ASTA trainees were considered to be part of the permanent crew and divided into duty watches." Because plaintiffs did not raise any claims stemming from the possible passenger status of their decedents in the district court, we will not consider them on appeal. See, e.g., Focus ___ ____ _____ Investment Assocs., Inc. v. American Title Ins. Co., 992 F.2d ________________________ _______________________ 1231, 1240 n.12 (1st Cir. 1993). 2. Recovery as Seamen ______________________ Plaintiffs argue that, even if their decedents are considered to have been seamen,5 they nonetheless may maintain a cause of action against the master for negligence under the general maritime law. Deciding whether they are right requires us to examine the history of negligence under the general maritime law. As a general matter, anyone who is the victim of a maritime tort is entitled to bring an action in admiralty. See, e.g., Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 413-14 ___ ____ ___________________ ____ (1953) (business invitees may bring a cause of action for negligence); cf. United NY & NJ Sandy Hook Pilots Ass'n v. ___ ________________________________________ Halecki, 358 U.S. 613, 632 (1959) ("the owner of a ship in _______ navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care"). Seamen, however, were  ____________________ 5. Defendant does not contest the seaman status of plaintiffs' decedents for purposes of the summary judgment motion. -17- 17 traditionally barred from exercising this remedy with respect to injuries caused by "the negligence of the master, or any member of the crew." The Osceola, 189 U.S. at 175; see also ____________ ___ ____ Gilmore & Black, The Law of Admiralty 6-21, at 328. ______________________ Congress, in response to the rule of The Osceola, passed the ___________ Jones Act in order to give seamen "the same rights to recover for negligence as other tort victims. It follows, therefore, that, if plaintiff is a seaman, he can recover under the Jones Act; if he is not a seaman, he can recover under the general maritime law." Gilmore & Black, The Law of Admiralty ____________________ 6-21, at 328-29. Thus, it appears that the general maritime law affords seamen no right to recover for injuries caused by a negligent master or crew member, but that they may recover for such injuries from their employer under the Jones Act. Plaintiffs make several arguments in an attempt to get around the rule that seamen have no general maritime cause of action for injuries caused by the negligence of the master or crew. First, plaintiffs cite Cerqueira v. _________ Cerqueira, 828 F.2d 863 (1st Cir. 1987); Stoot v. D & D _________ _____ ______ Catering Serv., Inc., 807 F.2d 1197 (5th Cir.), cert. denied, ____________________ _____ ______ 484 U.S. 821 (1987); Mahramas v. American Export Isbrandtsen ________ ___________________________ Lines, Inc., 475 F.2d 165 (2d Cir. 1973); and Favaloro v. S/S ___________ ________ ___ Golden Gate, 687 F. Supp. 475 (N.D. Cal. 1987), which they ____________ construe to grant seamen a cause of action for negligence -18- 18 under the general maritime law. Upon examining each of these cases, however, we find them distinguishable. In Cerqueira, we allowed the equitable owner of a _________ boat to sue his brother, the legal title owner of the boat, for simple negligence, positing that jurisdiction seemed proper on the basis of the court's general maritime jurisdiction. Cerqueira, 828 F.2d at 866. We did not, _________ however, consider the plaintiff to be a "seaman," nor do we think a shipowner would generally be accorded seaman status. Thus, while Cerqueira may be read to provide a cause of _________ action for negligence under the general maritime law, it does not support plaintiffs' argument that seamen are entitled to bring such an action for injuries arising from the negligence of the master or crew. In Stoot, the Fifth Circuit considered the claim of _____ a seaman injured during an altercation with the vessel's cook, who was employed by the defendant, an independent contractor providing catering services on board the vessel. The Fifth Circuit held that the catering company could not be held vicariously liable for the cook's intentional tort because it was committed outside the scope of her employment. Stoot, 807 F.2d at 1200. In so holding, however, the Fifth _____ Circuit stated that the catering company could have been held vicariously liable to the seaman for its employee's wrongful acts if the employee had been acting in the course and scope -19- 19 of her employment. Id. at 1199. Based on this, plaintiffs ___ argue that seamen may assert a cause of action for negligence under the general maritime law against independent contractors. Plaintiffs further argue that because Finlay's contract designated him as "self-employed," he should be treated as an independent contractor and his estate should be liable for his negligence under the general maritime law. We need not decide whether we would follow the Stoot dictum granting seamen a cause of action against third _____ parties for negligence under the general maritime law because we do not consider Finlay to have been a third party of the type envisioned by Stoot. Although his contract did _____ designate him as "self-employed," Finlay did not function as an independent contractor, but rather as an employee and agent of the owners of the MARQUES. Even if Finlay was an independent contractor, however, we would hesitate to extend Stoot to negligence actions under the general maritime law by _____ seamen against their independent-contractor masters, especially in light of the Supreme Court's holding that seamen cannot recover for the negligence of the master or crew under the general maritime law, see The Osceola, 189 ___ ____________ U.S. at 175. Mahramas involved a hairdresser working aboard a ________ cruise ship who was employed by the owner of the on-board beauty salon (not the shipowner) and who was injured when the -20- 20 ladder in her cabin allegedly gave way. Mahramas, 475 F.2d ________ at 167. We fail to see how this case provides a claim under the general maritime law against the master for negligence. To the extent that plaintiff argues that Mahramas granted the ________ plaintiff a general maritime cause of action for negligence against her independent-contractor employer (and therefore, by extension, that plaintiffs should have a general maritime cause of action for negligence against Finlay, since he was "self-employed"), we think that contention is belied by the case; the court did not consider the plaintiff's employer's liability for negligence under the general maritime law, but only under the Jones Act. See id. at 172. ___ ___ Favaloro involved claims brought by the estates of ________ fishermen killed when the defendant tanker collided with and sank their fishing boat. To the extent that it recognizes a cause of action for negligence under the general maritime law, Favaloro does not support the inference that such claims ________ may be brought by a seaman against the master of his own vessel, for it deals only with claims against a colliding vessel and the crew. See Favaloro, 687 F. Supp. at 477. ___ ________ Thus, all of the cases relied upon by plaintiffs are distinguishable from the instant case. As a second basis for finding that seamen may maintain an action against their masters for negligence under the general maritime law, plaintiffs rely on the "Seamen's -21- 21 Act of 1915," which provided: "In any suit to recover damages for any injury sustained on board vessel or in its service seamen having command shall not be held to be fellow- servants with those under their authority." See 46 U.S.C.A. ___ 688 (1975) historical note. Plaintiffs argue that this abolishes the fellow-servant rule, which the Supreme Court had referred to in The Osceola, 189 U.S. at 175, by stating: ___________ we think the law may be considered as settled upon the following propositions: . . . . 3. That all the members of the crew, except, perhaps, the master, are, ____________________________ as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure. (Emphasis added.) Plaintiffs conclude that because Congress abolished the fellow-servant rule, seamen may recover from their master for negligence under the general maritime law. We do not agree. The Osceola barred seamen from suing their master ___________ or fellow crew members not because of the fellow-servant rule, but rather because the general maritime law did not provide seamen with a cause of action for such negligence: we think the law may be considered as settled upon the following propositions: . . . . 4. That the seaman is not allowed to recover an indemnity for the -22- 22 negligence of the master, or any member of the crew. Id.; see Chelentis v. Luckenbach S.S. Co., 247 U.S. 372, 384 ___ ___ _________ ___________________ (1918) (characterizing the Seamen's Act of 1915 as "irrelevant" and holding that shipowners may not be held liable for the negligence of the crew); Gilmore & Black, The ___ Law of Admiralty 6-20, at 325-26 (describing Congress's _________________ abolition of the fellow-servant rule as an ill-fated attempt to abrogate The Osceola). We do not think the Seamen's Act ____________ of 1915, now itself abrogated by the Jones Act, provided seamen with a cause of action against a master for negligence under the general maritime law. We note that Kennedy v. Gulf _______ ____ Crews, Inc., 750 F. Supp. 214, 215-16 (W.D. La. 1990), the ____________ only other case that we know of to consider whether a master may be liable to a seaman for negligence under the general maritime law, rejected a similar argument by the plaintiff and held that a seaman does not have a cause of action against his master for negligence. Cf. California Home ___ ________________ Brands, Inc. v. Ferreira, 871 F.2d 830, 834-35 (9th Cir. _____________ ________ 1989) (holding that the Jones Act did not operate to make negligent crew members liable to their employers for damages paid to other seamen under the Jones Act because crew members cannot sue each other for negligence). We hold that the general maritime law does not afford seamen a cause of action for negligence against masters. Accordingly, summary judgment was properly granted -23- 23 to defendant on plaintiffs' counts for negligence under the general maritime law. E. DOHSA _________ Plaintiffs argue that they are entitled to recover against defendant under DOHSA, which provides: Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas . . . the personal representative of the decedent may maintain a suit for damages  . . . for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued. 46 U.S.C. 761. The district court held that DOHSA does not create any substantive rights, but merely provides a cause of action against a party "which would have been liable if death had not ensued." See McAleer, 818 F. Supp. at 496. We ___ _______ agree. Plaintiffs assert no theory of recovery against defendant: they may not recover against defendant under the general maritime law for unseaworthiness, under the Jones Act for negligence, or under the general maritime law for negligence. Accordingly, there is no basis under which Finlay or his estate "would have been liable" to plaintiffs' decedents if they were still living. Thus, summary judgment was properly granted to defendant for plaintiffs' claims under DOHSA. III. III. ____ CONCLUSION CONCLUSION __________ -24- 24 In conclusion, summary judgment was properly granted to defendant because (1) Finlay was not an owner pro ___ hac vice of the MARQUES and so was not liable for ___ ____ unseaworthiness; (2) Finlay was not the employer of plaintiffs' decedents and so was not liable under the Jones Act; (3) plaintiffs did not argue below that they were not seamen and therefore were entitled to sue a master for negligence under the general maritime law; (4) seamen may not bring a cause of action against a master for negligence under the general maritime law; and (5) plaintiffs may not recover under DOHSA because they assert no theory of recovery under which Finlay or his estate would have been liable to plaintiffs' decedents if they were still living. In light of our holding, we need not consider plaintiffs' request for us to transfer the case to the District of Massachusetts. Affirmed. Affirmed. _________ -25- 25